# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEXANDER DETSCHELT, | ) | CIVIL ACTION NO:    23-1402 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORWIN SCHOOL DISTRICT and | ) | |
| JEFFREY M. TAYLOR, | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes Plaintiff Alexander Detschelt ("Mr. Detschelt"), by and through his undersigned attorneys, files this Complaint in Civil Action, and in support thereof avers as follows:

## JURISDICTION

1.      This action is brought pursuant to 42 U.S.C. § 1983 against the Defendants for violation of Mr. Detschelt's rights under the First Amendment of the United States Constitution.

2.      Jurisdiction exists pursuant to 28 U.S.C. § 1331 and § 1343(a)(3).

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because all claims set forth herein arose in the Western District of Pennsylvania.

## PARTIES

4.      Mr. Detschelt is an adult male individual and a resident of Westmoreland County, Pennsylvania. At all times relevant to this Complaint, Mr. Detschelt was, and is, a duly elected member of the Norwin Board of Education ("the Board").

5.      Defendant Norwin School District (the "School District") is a Pennsylvania municipal corporation with administrative offices located at 281 McMahon Drive, North Huntingdon, Pennsylvania 15642. At all times relevant to this Complaint, the School District acted

by and through its duly elected and appointed officials, including, but not limited to, Defendant Dr. Jeffrey M. Taylor ("Dr. Taylor").

6.  Dr. Taylor is an adult male individual and a resident of Allegheny County, Pennsylvania, who currently resides at 116 Drood Lane, Pittsburgh, PA 15237. At all times relevant to this Complaint, Dr. Taylor was and is the duly elected and commissioned Superintendent of the School District.

## FACTS

7.  Mr. Detschelt is one of nine elected directors of the Board for the School District. Mr. Detschelt was elected in November 2021, and he commenced his four-year term as a director in December 2021, with an expiration date for the position set for the end of November 2025.

8.  Previously, on July 1, 2019, the Board hired Dr. Taylor as the Superintendent.  At all times relevant to the and, Dr. Taylor acted in his capacity as Superintendent, performed all his work-related job duties and tasks as an agent of the School District and, in so doing, acted under the color of state law because he exercised official authority granted by county or local law.

9.  On January 17, 2022, the Board convened a public meeting, which was legislative in nature. During that meeting, a contentious debate occurred between Dr. Taylor and Mr. Detschelt concerning the daily broadcast of CNN-10 ("CNN Broadcast") to all the students in the School District during the "homeroom" period.  More specifically, Dr. Taylor supported the CNN Broadcast in the schoolroom while Mr. Detschelt opposed the CNN Broadcast in the schoolroom.

10.  Less than a month later, on February 14, 2022, the Board conducted a workshop meeting.  At that meeting, the Board passed a motion advocated by Mr. Detschelt to prohibit the daily CNN Broadcast to all students during the homeroom period.

11.      Shortly thereafter, Mr. Detschelt received national media coverage because he played a key role in removing the politicized programing of the CNN Broadcast, which was aired at the School District's students to promote the political ideology and preference of the School District's Administration.

12.      By contrast, Dr. Taylor received considerable criticism from the public as Superintendent because he was in charge with the duty of providing administrative oversight over the entire School District and he openly supported the politicized daily agenda of the CNN Broadcast.

13.      In subsequent public meetings of the Board, Mr. Detschelt, as a member of the Board Policy Committee, discussed and recommended that the Board adopt an official policy that prevented teachers from discussing their personal political views in the classroom.  In the meantime, Dr. Taylor continued to announce his dissatisfaction with Mr. Detschelt in subsequent public meetings of the Board.

14.      On June 6, 2022, during an executive session of the Board, Russell Lucas, Esq., who is a partner at Andrews & Price and served as the firm's lead counsel in its solicitorship for the School District, distributed printouts of this Court's opinion in Zurchin v. Ambridge Area Sch. Dist., 300 F. Supp. 3d 681 (W.D. Pa. 2018), which found that a hostile work environment existed as a result of particular behaviors and comments that a school district's board of school directors made toward and against a school administrator.

15.      Attorney Lucas informed the Board that the Zurchin decision provided him with concern that the prior comments made by Mr. Detschelt and Director Shawna Ilagan, which were critical of Dr. Tayler in performing his job duties as Superintendent, could expose the Board to legal civil liability, akin the situation in Zurchin.

16.     Importantly, the type of behavior that amounted to a hostile work environment in
<u>Zurchin</u> included direct personal insults, false statements for the purpose of public humiliation,
overt threats of public physical attack, physical intimidation, and a physical confrontation that had
to be separated by the use of force.

17.     Attorney Lucas instructed the Board that it could potentially be liable pursuant to
the <u>Zurchin</u> decision because Mr. Detschelt and Director Ilagan made the following statements
regarding Dr. Taylor:

    a.     Mr. Detschelt made comments to the media that criticized Dr. Taylor for
        promoting the CNN Broadcast;

    b.     Director Ilagan referred to Defendant Taylor as "Jeff" rather than "Dr.
        Taylor" or Superintendent Taylor on more than one occasion during
        meetings of the Board;

    c.     Director Ilagan had insinuated that Dr. Taylor was "a liar"; and

    d.     In an email from Director Ilagan to Dr. Taylor, Director Ilagan referred to
        Dr. Taylor as "dismissive and disrespectful."

18.     Importantly, all of the statements that Mr. Detschelt and Director Ilagan made with
respect to Dr. Taylor were proper statements and topics to bring before the Board because they
were fair comments and criticism that directly related to the conduct and performance of Dr.
Taylor, solely in his role and capacity as Superintendent, and were not intended to insult or threaten
Dr. Taylor, but were asserted in order to address issues that were exclusively related to the
administration of school business.

19.     The honest, genuine, and candid criticisms that Mr. Detschelt and Director Ilagan
made toward and against Dr. Taylor during the Board meetings regarded matters of public concern

and related to official school business and, as such, did not rise anywhere near to the egregious level of harassment, false insults, threats of violence, and physical confrontation as discussed in Zurchin.

20.     As noted previously, Attorney Lucas brought the Zurchin case to the attention of the Board in reaction to the prior comments that Mr. Detschelt and Director Ilagan made that were critical of Dr. Taylor, with whom Mr. Lucas shares political goals that are diametrically opposed to those of Mr. Detschelt and Director Ilagan.

21.     Attorney Lucas provided the Zurchin opinion to the Board in his capacity as the School Solicitor responsible for advising the Board on legal matters and utilized the Zurchin opinion in an attempt to prevent Mr. Detschelt and Director Ilagan from voicing any further concerns or criticism of Dr. Taylor through fear, intimidation, and implicit coercion.

22.     Moreover, at that same June 6, 2022 public meeting mentioned above, Mr. Detschelt gave a presentation to the Board, wherein he expressed the views and impressions that he had formed during the first six months of his term as a School Board Director and, in the process, made statements and comments that were critical of the School District's Administration.

23.     Subsequently, at a Board meeting held on October 17, 2022, Mr. Detschelt and Director Wayman informed the Board that its Superintendent Evaluation was in violation of section 1073.1 of the School Code because it was unlawfully submitted without the feedback from the entire Board.

24.     A few days later, on October 25, 2022, Mr. Detschelt posted an image of a joke Halloween costume package (the "Meme") on the Norwin Area Talk Facebook page, which is a private community for "people to talk/vent without having to be politically correct," and the Meme

contained and displayed the word "retard." A true and correct copy of the Meme is attached as

Exhibit A.

25.     Shortly after he posted the Meme, Mr. Detschelt removed it and posted an apology

as follows:

> Sorry if anyone was offended by my costume meme that was in the same light as
> the meme above except for the word "retard" in the costume description. It's a
> meme, that's all it was with no I'll [sic] intent, but I've removed it due to some
> people reaching out feeling strongly against it.

A true and correct copy of the above comment is attached hereto as Exhibit B.

26.     Later that same day, Mr. Detschelt posted the following in another private

Facebook group called "Norwin 5 Days Strong!!!":

> I need to clear up some nonsense that's been taken out of context (as is the case
> with most of the stuff I say or do). Earlier today I posted a "costume meme" in a
> different group after a similar "costume meme" (about Uncle Festerman) was
> posted, but the one I reposted contained the word "retard" in it. I didn't make the
> meme and my comment to the meme was regarding the virtue signaling liberals
> that the costume would appeal to – "retard" was part of the meme and not something
> I would use in regular conversation. The screenshot that's been circulating is the
> one with just the meme I posted, alone, so the context to why it was posted was
> missing.
>
> I don't take issue with words unless they are used in a direct offensive context and
> to me, they are still just words. However, a parent of a special needs child called
> me today and told me that although she doesn't see the meme as *me* saying
> something offensive via that meme, the word caused emotions to run through her
> because her son has been called retarded over the years by other kids. She indicated
> that other parents may also have a similar emotional reaction when seeing that
> word. Therefore, I took the post down.
>
> …but I still stand by the humor of the overall meme and hope it makes the libs
> "Reeeeeeeeee"

A true and correct copy of the above comment is attached hereto as Exhibit C.

27.     In expressing the above-mentioned statements, Mr. Detschelt was speaking as a

private citizen when he posted the Meme, made subsequent apologies from his private Facebook

account, and placed the comments in a private Facebook group, on his own personal time, and the

comments were completely unrelated to his duties as a School Board Director or to the School District.

28.     Mr. Detschelt was not acting in his official and public capacity as Director of the Board when he posted the Meme or issued the subsequent apologies.

29.     By email dated October 28, 2022, Dr. Taylor informed the Board that he drafted an official statement on behalf of the School District (hereinafter referred to as the "District's Official Statement") and openly announced his intention to send the District's Official Statement to all the so-called "stakeholders" of the School District for his stated purpose "to minimize misinformation being disseminated on social media."  A true and correct copy of the above-mentioned email is attached hereto as Exhibit D and the District's Official Statement is attached hereto as Exhibit E.

30.     Also on October 28, 2022, Dr. Taylor sent the District's Official Statement to the School District's "e-Blast" email list.

31.     The District's "Official Statement," authored by Dr. Taylor, named the sole offender as "a member of the Norwin Board of Education, Mr. Alex Detschelt."

32.     To deliberately amplify the reputational harm to Mr. Detschelt, the District's Official Statement intentionally placed Mr. Detschelt in a false light by making false statements and omitting contextual and factual information that was necessary for a reasonable person to actually assess the totality of the circumstances and the nature of Mr. Detschelt's behavior.

33.     For instance, the District's Official Statement stated that "The District was made aware of social media posts shared on Facebook by a member of the Norwin Board of Education, Mr. Alex Detschelt, containing the 'R-word' and later edited to include the 'Reee' phrase."

34.     However, the District's Official Statement intentionally and knowingly omitted that Mr. Detschelt had apologized twice for the above-mentioned incident, and, instead suggested to

the "stakeholders" that Mr. Detschelt "doubled down" and compounded the offensiveness of the Meme by "later editing" the post to "include the 'Reee' phrase," which, through natural implication, is a comment that expresses Mr. Detschelt's personal political and/or social views.

35.     Further, the District's Official Statement failed to mention that Mr. Detschelt only posted the posts at issue on two private Facebook groups and, in so doing, falsely suggested that Mr. Detschelt posted the Meme on an openly public forum that was accessible to the entire public.

36.     In addition, the District's Official Statement omitted that Mr. Detschelt posted the Meme to a private Facebook group that specifically warns the members of the group that sensitive persons should avoid it and that "politically incorrect" content is not only likely, but completely acceptable topic for discussion in and among the community forum.

37.     According to the School District's Communication Plan (attached hereto as "Exhibit F"), the "stakeholders" of the School District includes: students, teachers, employees, administrators, Board of Education, Parents and Guardians, PTA, alumni, households in the district without children, local businesses and organizations, members of the local/regional/state media organizations including news/TV/social media influencers; community leaders, cyber charter/private/parochial school families, and youth organizations including sprots/park/recreation/day care/preschool providers.

38.     On information and belief, the District's Official Statement was delivered to 7,713 "stakeholders" of the School District through the e-Blast email list.

39.     Also on October 28, 2022, the School District issued a press release (the "Press Release") substantially identical to the District's Official Statement. A true and correct copy of the Press Release is attached hereto as Exhibit F.

40.     Dr. Taylor devised, issued, and publicly released the District's Official Statement and the Press Release both in retaliation for Mr. Detschelt (1) posting the Meme and subsequent apologies and (2) previously criticizing and opposing Dr. Taylor in his performance as Superintendent and highest-ranking public official of School District's Administration.  Absent these retaliatory motives, Dr. Taylor would not have devised, issued, and publicly released the District's Official Statement and Press Release.

41.     Dr. Taylor issued the District's Official Statement and Press Release with the sole purpose and effect of chilling and deterring Mr. Detschelt from engaging in pure speech and expressive conduct that is protected by the First Amendment, activity such as criticizing the administrative regime of the School District or privately posting potentially offensive memes on private Facebook pages that are nonetheless with in the ambit of speech covered by the First Amendment.

42.     The District's Official Statement adversely affected Mr. Detschelt's protected speech and his ability to perform his job as School Board Director. For instance, as a result of the District's Official Statement and Press Release, Mr. Detschelt received significant backlash from numerous "stakeholders," including, among other things, demands that he resign from his position as Director and overt and express threats of physical violence.

43.     On behalf of the School District and in his official capacity as Superintendent, Dr. Taylor intentionally created and released the District's Official Statement and Press Release with full knowledge, awareness, and the expectation that the above-mentioned incidents of backlash would almost certainly occur and that Dr. Detschelt would be subjected to both criticism and threats.

44.     Consequently, such backlash was the natural, predictable, and foreseeable effect of the District's Official Statement and Press Release, and Dr. Taylor retaliated against Mr. Detschelt for exercising his First Amendment rights.

**COUNT I**
**Plaintiff v. All Defendants in their Official Capacity and as Individuals**
**42 U.S.C. §1983 -- Retaliation in violation of First Amendment**

45.     The preceding paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

46.     The Defendants retaliated against Mr. Detschelt on the basis of speech that related directly to and involved matters of public concern, i.e., speech that was political, social, or subject to legitimate news and general interests of the community and public.

47.     The conduct and actions of Defendants set forth above were sufficient to deter any reasonable person of ordinary firmness from exercising his or her constitutional rights. The conduct and actions of Defendants did, in fact, hinder Mr. Detschelt in his ability to engage in free speech and, further, deterred him from exercising his rights to free speech in the future and retaliated against him for exercising those rights in the past.

48.     The rights to (1) make non-threatening comments that are critical of Dr. Taylor's work as Superintendent and the School District Administration and (2) post a comment in a meme that was socially inappropriate and politically incorrect—but non-threatening in nature and nowhere near "hate speech"—was free speech that was clearly established by law to be protected by the First Amendment at the time Dr. Taylor released the District's Official Statement and Press Release.

49.     The right to engage in the above-mentioned speech was so apparent that any reasonable public official, standing in the shoes of Mr. Dr. Taylor as the Superintendent, would

understand and recognize that issuing the District's Official Statement and Press Release constituted unlawful retaliation in violation of Mr. Detschelt's First Amendment right of free speech.

50.     As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Mr. Detschelt has suffered—and continues to suffer—substantial past and future damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, embarrassment, and humiliation.

51.     Because Defendants' actions were motivated by evil motive, intent, and/or involved a reckless or callous indifference to the federally protected rights of Mr. Detschelt, an award of punitive damages is appropriate.

WHEREFORE, Plaintiff Alexander Detschelt respectfully requests that this Court enter judgment in his favor and award Plaintiff compensatory damages, costs incurred in this proceeding, attorney's fees, and punitive damages; and, further, grant such other relief that the Court deems just, equitable, or proper.

Respectfully submitted,

**OGC LAW, LLC**

By:     /s/ Adam G. Locke
         Adam Locke, Esq.
         Pa. Id. No. 200441
         Gregory H. Teufel, Esq.
         PA Id. No. 73062
         1575 McFarland Rd, Suite #201
         Pittsburgh, Pennsylvania 15216
         (412) 253-4622
         gteufel@OGCLaw.net
         *Attorneys for Defendant Alexander Detschelt*