IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALEXANDER DETSCHELT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 23-1402 |
| | ) |
| NORWIN SCHOOL DISTRICT and | ) |
| JEFFREY M. TAYLOR, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

Plaintiff Alexander Detschelt ("Detschelt") brings this action, pursuant to 42 U.S.C. § 1983, against Defendants Norwin School District and Jeffrey M. Taylor, alleging retaliation for engaging in protected speech, in violation of the First Amendment of the Constitution of the United States. (Docket No. 1). Presently before the Court is the "Motion to Dismiss of Defendants, Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure" and supporting brief (Docket Nos. 8, 9), Detschelt's response and brief in opposition (Docket Nos. 10, 11), and Defendants' reply brief (Docket No. 14). The Court has also reviewed the supplemental submission filed by Defendants (Docket No. 20), as well as Detschelt's reply thereto (Docket No. 21). After careful consideration of the parties' arguments and for the following reasons, Defendants' motion will be granted, and Detschelt's claim against Defendants will be dismissed.

**I.   BACKGROUND**

As the parties are well-acquainted with the factual background of this case, at this juncture the Court will present an abbreviated version of the facts, as alleged in the Complaint[1] and in the

---

[1] Detschelt contends that this Court has subject matter over his constitutional claim pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). (Docket No. 1, ¶ 2).

light most favorable to Detschelt, that are relevant to the motion presently before the Court. Detschelt is a resident of Westmoreland County, Pennsylvania, and at all times relevant to the Complaint, was and is a duly elected member of the Norwin Board of Education (the "School Board" or the "Board"). (Docket No. 1, ¶ 4). Defendant Norwin School District (the "School District") is a Pennsylvania municipal corporation, and at all times relevant to the Complaint, the School District acted by and through its duly elected and appointed officials, including Defendant Dr. Jeffrey M. Taylor ("Dr. Taylor"). (*Id.* ¶ 5). Dr. Taylor is a resident of Allegheny County, Pennsylvania, and at all times relevant to the Complaint, was and is the duly elected and commissioned Superintendent of the School District. (*Id.* ¶ 6).

As alleged in the Complaint, on January 17, 2022, the School Board convened a public meeting, during which a contentious debate occurred between Dr. Taylor and Detschelt concerning the daily broadcast of CNN-10 (the "CNN Broadcast") during the homeroom period to all School District students. (Docket No. 1, ¶ 9). Dr. Taylor supported showing the CNN Broadcast, while Detschelt opposed it. (*Id.*). On February 14, 2022, the School Board conducted a workshop during which it passed a motion, advocated by Detschelt, prohibiting the CNN Broadcast. (*Id.* ¶ 10).

Shortly thereafter, Detschelt received national media coverage for playing a key role in removing the CNN Broadcast, while, according to the Complaint, Dr. Taylor received criticism from the public as Superintendent because he was in charge of providing administrative oversight to the School District and because he had supported showing the CNN Broadcast. (Docket No. 1, ¶¶ 11, 12). In subsequent public meetings of the School Board, Detschelt, as a member of the School Board's Policy Committee, discussed and recommended that the Board adopt an official policy that prevented teachers from discussing their personal political views in the classroom, and Dr. Taylor announced his dissatisfaction with Detschelt in later meetings. (*Id.* ¶ 13).

During a School Board executive session on June 6, 2022, attorney Russell Lucas ("Lucas"), whose law firm was acting as the School District's Solicitor, distributed printouts of a judicial opinion issued in *Zurchin v. Ambridge Area School District*, 300 F. Supp. 3d 681 (W.D. Pa. 2018), in which the court found that a hostile work environment existed because of particular behaviors and comments that a school district's board of directors had made regarding a school administrator. (Docket No. 1, ¶ 14). According to the Complaint, Lucas brought *Zurchin* to the School Board's attention in reaction to prior comments, made by Detschelt and another School Board Director, that were critical of Dr. Taylor, with whom Lucas "shares political goals that are diametrically opposed to those of" Detschelt and the other School Director involved. (*Id.* ¶ 20). The Complaint avers that Lucas provided the *Zurchin* opinion to the Board in an attempt to prevent Detschelt and his fellow School Board Director from voicing any further concerns or criticism of Dr. Taylor through fear, intimidation, and implicit coercion. (*Id.* ¶ 21). At the same meeting, Detschelt gave a presentation to the School Board in which he expressed the views and impressions that he had formed during the first six months of his term as a School Board Director, and Detschelt made statements and comments that were critical of the School District Administration. (*Id.* ¶ 22).

At a School Board meeting on October 17, 2022, Detschelt and another School Board Director informed the Board that its Superintendent Evaluation was in violation of the School Code because the evaluation was unlawfully submitted without the feedback from the entire School Board. (Docket No. 1, ¶ 23).

A few days later, on October 25, 2022,[2] Detschelt posted an image of a satirical Halloween costume package (the "Meme") on the Norwin Area Talk Facebook page, which Detschelt describes as a private community for "people to talk/vent without having to be politically correct."

---

[2]    The Court takes judicial notice that Pennsylvania's general election took place on November 8, 2022.

3

(Docket No. 1, ¶ 24). Detschelt posted the Meme with the message "I call your Uncle Festerman and raise you with a virtue signaler" in apparent reference to another meme depicting then-senatorial candidate John Fetterman and referring to him as a "Supersized Slacker." (*Id.*; Docket Nos. 1-1, 1-2). The Meme Detschelt posted contained and displayed the phrase "[Expletive deleted] Retard" in reference to a person depicted with a "Medical Mask" and "Virtue Cape" who has had "3 [presumably Covid] Boosters" and has a "Sense of Superiority." (Docket No. 1-1). Shortly after posting the Meme, Detschelt removed it and posted the following message:

> Sorry if anyone was offended by my costume meme that was in the same light as the meme above [referencing the meme depicting Fetterman] except for the word "retard" in the costume description. It's a meme, that's all it was with no I'll [sic] intent, but I've removed it due to some people reaching out feeling strongly against it.

(Docket No. 1, ¶ 25; Docket No. 1-2). Later that day, Detschelt posted the following message in another private Facebook group (a group called "Norwin 5 Days Strong!!!"):

> I need to clear up some nonsense that's been taken out of context (as is the case with most of the stuff I say or do). Earlier today I posted a "costume meme" in a different group after a similar "costume meme" (about Uncle Festerman) was posted, but the one I reposted contained the word "retard" in it. I didn't make the meme and my comment to the meme was regarding the virtue-signaling liberals that the costume would appeal to – "retard" was part of the meme and not something I would use in regular conversation. The screenshot that's been circulating is the one with just the meme that I posted, alone, so the context to why it was posted was missing.
>
> I don't take issue with words unless they are used in a direct offensive context and to me, they are still just words. However, a parent of a special needs child called me today and told me that although she doesn't see the meme as *me* saying something offensive via that meme, the word caused emotions to run through her because her son has been called retarded over the years by other kids. She indicated that other parents may also have a similar emotional reaction when seeing that word. Therefore, I took the post down.
>
> …but I still stand by the humor of the overall meme and hope it makes the libs "Reeeeeeeeee."

(Docket No. 1, ¶ 26; Docket No. 1-3).

4

In an email dated October 28, 2022, Dr. Taylor informed the School Board that he had drafted an official statement on behalf of the School District (the "District's Statement" or the "Statement"), and announced his intention to send the Statement to the "stakeholders" of the School District in order "to minimize misinformation being disseminated on social media." (Docket No. 1, ¶ 29). Also on that day, Dr. Taylor sent the Statement to the stakeholders through the School District's "e-Blast" email list. (*Id.* ¶ 30). According to the School District's Communication Plan (attached to the Complaint), there are approximately 7,713 stakeholders of the School District, including students, teachers, employees, administrators, Board of Education, Parents and Guardians, PTA, alumni, households in the district without children, local businesses and organizations, etc. (*Id.* ¶¶ 37, 38). The District's Statement indicated as follows:

> Dear Norwin Families and School Community,
>
> As you may be aware, over the past week, a member of the Norwin Board of Education posted several comments on social media which have offended many employees and members of our school community.
>
> As advocates for all children, it is the District's responsibility to promote our Board-approved Mission, Vision, and Core Values. The mission of the Norwin School District is to provide a positive, learner-centered environment that supports the growth of all students. Our Core Values include: (1) "nurturing the health and well-being of students and relationships," and (2) "promoting a positive school climate and safe environment."
>
> In response to media inquiries about the posts, the District has shared an official statement. I am including a copy of the statement below for your information.
>
> Best regards,
>
> Dr. Jeff Taylor,
> Superintendent
>
> **District Official Statement:**
>
> The District was made aware of social media posts shared on Facebook by a member of the Norwin Board of Education, Mr. Alex Detschelt, containing the "R-word" and later edited to include the "Reee" phrase. The District recognizes

> that many found his posts to be insensitive and offensive not only to our families of students with special needs, but to members of our school community.
>
> The Norwin School District does not condone nor support the use of these terms in any capacity. While Mr. Detschelt spoke on his own behalf, it is important to note that his social media posts represent his personal views and do not represent, nor reflect, the views of the Norwin School District, the District Administration, or the Norwin Board of Education.
>
> The Norwin School District and the Norwin Board of Education do not believe in discrimination on the basis of handicap, disability, or political affiliation in its educational or employment programs and activities. We believe in embracing empathy for all by promoting equality, diversity, and inclusivity.
>
> The mission of the Norwin School District is to provide a positive, learner-centered environment that supports the growth of *all* students.
>
> No further comment will be issued at present regarding this matter.

(Docket No. 1-5).  Also on October 28, 2022, the School District issued a press release (the "Press Release"), which is substantially identical to the District's Statement.  (Docket No. 1, ¶ 39; Docket No. 1-6).

According to the Complaint, Dr. Taylor devised, issued, and publicly released the District's Statement and Press Release in retaliation for Detschelt:  (1) posting the Meme and what he characterizes as apologies, and (2) previously criticizing and opposing Dr. Taylor in his performance as Superintendent and highest-ranking public official of the School District's Administration.  (Docket No. 1, ¶ 40).  Detschelt further alleges that Dr. Taylor issued the District's Statement and Press Release for the sole purpose and effect of chilling and deterring Detschelt "from engaging in pure speech and expressive conduct" protected by the First Amendment, "activity such as criticizing the administrative regime of the School District or privately posting potentially offensive memes on private Facebook pages that are nonetheless with in the ambit of speech covered by the First Amendment."  (*Id.* ¶ 41).  Detschelt avers that the District's Statement adversely affected his protected speech and ability to perform his job as

6

School Board Director, *e.g.,* he received significant backlash from numerous "stakeholders" that included demands that he resign and express threats of physical violence. (*Id.* ¶ 42).

In Count I, the sole Count of the Complaint, Detschelt alleges that Defendants retaliated against him on the basis of his speech that related directly to and involved matters of public concern, *i.e.*, speech that was political, social, or subject to legitimate news and general interests of the community and public. (Docket No. 1, ¶ 46). Detschelt avers that Defendants' conduct was sufficient to deter any reasonable person of ordinary firmness from exercising his or her constitutional rights and that the conduct, in fact, hindered Detschelt in his ability to engage in free speech, deterred him from exercising his rights to free speech in the future, and retaliated against him for exercising those rights in the past. (*Id.* ¶ 47). Detschelt alleges that he had the right to 1) make non-threatening comments critical of Dr. Taylor's work as Superintendent and the School District Administration, and 2) post a comment in a meme that was socially inappropriate and politically incorrect but non-threatening in nature and nowhere near "hate speech," which constituted free speech that was clearly established by law to be protected by the First Amendment at the time Dr. Taylor released the District's Statement and Press Release. (*Id.* ¶ 48). Detschelt seeks compensatory damages, costs, attorney fees, punitive damages, and such other relief that the Court deems just, equitable, or proper. (*Id.* at 11).

Defendants have filed their motion to dismiss, it has been fully briefed by the parties, and it is ripe for decision.

## II.     STANDARD OF REVIEW

### A. Rule 12(b)(6)

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the

7

plaintiff, and the court must "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).  While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted)).  Moreover, while "this standard does not require 'detailed factual allegations,'" Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

It should be further noted, therefore, that in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).  Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted)).

To review a complaint under this standard, the Court proceeds in three steps. *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). First, the Court notes the elements of a claim. *See id.* (citing *Iqbal*, 556 U.S. at 675). Second, the Court eliminates conclusory allegations. *See id.* (citing *Iqbal*, 556 U.S. at 679). And finally, the Court assumes the remaining well-pleaded facts are true and assesses "'whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

### B. Qualified Immunity

The qualified immunity doctrine "shield[s] government officials performing discretionary functions . . . 'from liability [for] civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not a "mere defense to liability," but rather it is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). It is thus important to "resolv[e] immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)). In considering a claim of qualified immunity, a court must determine both whether the plaintiff has shown a violation of a constitutional right and whether the right was "clearly established" at the time of the alleged constitutional violation. *See id.* (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### III. DISCUSSION

Detschelt brings his constitutional claim pursuant to 42 U.S.C. § 1983, which does not create any substantive rights, but rather provides a remedy for deprivations of rights created by the Constitution of the United States or federal law. *See City of Oklahoma City v. Tuttle*, 471 U.S.

9

808, 816 (1985).  Thus, "[t]o state a claim for relief in an action brought under § 1983, [a plaintiff] must establish that [he was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."[3] *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  In this case, Detschelt asserts that Defendants violated his right to engage in free speech without retaliation under the First Amendment to the Constitution of the United States.  (Docket No. 1 at 10-11).

### A.    First Amendment Retaliation

To plead a claim of retaliation for the exercise of First Amendment rights, a plaintiff must adequately allege the following three elements:  "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action."  *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017).  Notably, the first element of a First Amendment retaliation claim concerns the plaintiff's conduct, while the second element concerns the defendant's conduct.  *See Caristo v. Blairsville-Saltsburg Sch. Dist.*, 370 F. Supp. 3d 554, 570-71 (W.D. Pa. 2019).

#### 1.    First Element:  Detschelt's Constitutionally Protected Conduct

In his Complaint, Detschelt alleges that Defendants retaliated against him for exercising his constitutional right to:  (1) make comments that were critical of Dr. Taylor's work as Superintendent and the School District Administration ("Superintendent/Administration criticism"); and (2) post a meme and related comments on Facebook that were "socially inappropriate and politically incorrect" ("Facebook posts").  (Docket No. 1, ¶¶ 46, 48).  Detschelt specifically alleges that the Facebook posts were made in his capacity as a private citizen (*id.* ¶ 27),

---

[3]    The parties do not appear to dispute that Dr. Taylor and the members of the School Board are state actors.

10

whereas, although Detschelt does not specifically allege so, his criticisms of the Superintendent and the School District's Administration appear to have been made in Detschelt's official capacity as a School Board Director.[4]   Despite identifying these two different types of speech in the Complaint, Detschelt's response to Defendants' Motion to Dismiss seemingly narrows the basis of his claim to his Facebook posts made as a private citizen, and not his Superintendent/Administration criticism made as a School Board Director.

Specifically, in responding to Defendants' motion, Detschelt initially states that he "has pled adequate facts to sustain the inference that the Defendants engaged in legally sufficient adverse retaliatory actions against him for exercising core First Amendment rights while acting **in his capacity as a private citizen**." (Docket No. 11 at 2 (emphasis added)).  Later on, Detschelt explains that he filed his Complaint "asserting one count for retaliation under the First Amendment because the Defendants intentionally inflicted adverse actions and consequences upon him **solely because** he exercised the cherished and adorned constitutional rights to free speech and political affiliation/association **in his capacity as a private citizen**." (*Id.* at 8 (emphasis added)). Moreover, although he notes his official speech that was critical of Defendants in summarizing the factual background, in making his argument in opposition to Defendants' motion, Detschelt focuses on his Facebook posts, and not his Superintendent/Administration criticism. (*Id.* at 9-10). For example, Detschelt argues that, in moving to dismiss:

> . . . Defendants completely disregard the averments in the Complaint which emphasize that, at all times pertinent hereto, Mr. Detschelt was acting as private citizen, discussing public affairs, i.e., politics, and on matters wholly unrelated to his duties as a Board member, and in a private context where there was nothing, including the Meme, that could remotely suggest that Mr. Detschelt was proceeding in an official capacity or represented the views of the Board or

---

[4] For example, many of Detschelt's allegations concern his criticisms of the Superintendent/Administration that occurred during School Board meetings (Docket No. 1, ¶¶ 9, 10, 13, 22, 23) and/or concern his "proper statements and topics to bring before the Board because they were fair comments and criticism" that were "asserted in order to address issues that were exclusively related to the administration of school business" (*id.* ¶¶ 17, 18).

11

the School District.

(*Id.* at 10). Detschelt then states that he "surely does not forfeit his core First Amendment rights when he acts as a private individual in a private forum simply because he wears the other hat of being a member of the Board." (*Id.*). Detschelt further explains that:

> While the Defendants devote much of their brief alleging that Dr. Taylor sanctioned and punished Mr. Detschelt because Mr. Detschelt was acting in an official capacity and as a public figure, as a member of the Board engaged in the political process . . . **Mr. Detschelt avers a completely different set of facts, an entirely opposite contrast and painting of the story, asserting that he was retaliated against for exercising First Amendment rights as a private citizen**.

(*Id.* at 12 (emphasis added)).

Since, in his opposition brief, Detschelt does not address or defend his allegation of retaliation to the extent it is based on his criticisms of the Superintendent and the School District's Administration and addresses retaliation only to the extent it is based on his Facebook posts made as a private citizen, it appears that Detschelt may no longer wish to pursue his claim of retaliation based on his criticisms expressed as a member of the School Board, and since the Court is dismissing the Complaint without prejudice to amendment, the Court presently will limit its analysis to whether the Complaint states a plausible claim of retaliation based on the Facebook posts Detschelt avers to have made as a private citizen.

Notably, Detschelt asserts that Defendants retaliated against him "on the basis of speech that related directly to and involved matters of public concern, i.e., speech that was political, social, or subject to legitimate news and general interests of the community and public." (Docket No. 1, ¶ 46). Thus, Detschelt argues that his Facebook posts are a matter of public concern and are protected by the First Amendment, while Defendants do not explicitly agree with this contention.[5]

---

[5] *See* Docket No. 9 at 12 ("Setting aside the issue of whether Plaintiff's pejorative reference to a "[Expletive deleted] Retard" was protected by the First Amendment . . . .").

12

For purposes of considering Defendants' Motion to Dismiss, the Court finds that the Complaint plausibly alleges speech in Detschelt's Facebook posts that is a matter of public concern because such posts included a meme of Senator Fetterman and referred critically to Covid-related measures and "liberals" shortly before an election for which Fetterman was on the ballot. (Docket Nos. 1-1, 1-2, 1-3). Accordingly, the Court finds that Detschelt engaged in constitutionally protected conduct when he posted the meme and meme-related comments – matters of public concern – as a private citizen, and thus that he sufficiently pleads the first element of a First Amendment retaliation claim.

### 2. Second Element: Defendant's Retaliatory Action

As to the second element of his First Amendment retaliation claim, Detschelt alleges that Defendants retaliated against him by issuing the District Statement and Press Release, which are essentially identical in the speech they contain.[6] (Docket No. 1, ¶¶ 39, 40). The parties dispute whether such act by Defendants – issuing the District Statement, its own official speech – was, in fact, retaliatory.[7]

"Because the alleged retaliatory conduct by [Defendants] is in the form of [its] own speech

---

[6] Because the District Statement and Press Release contain nearly identical language and were released near the same time, the Court will refer to both herein as the "District Statement."
  Additionally, the Court disagrees with Defendants to the extent they argue that this second element cannot be satisfied because Detschelt has continued to exercise his constitutional free speech rights. (Docket No. 20 (Defendants' Supplemental Brief in Support of Motion to Dismiss)). Such argument fails because "whether an act is retaliatory is an objective question." *Mirabella*, 853 F.3d at 650 (citing *Bistrian v. Levi*, 696 F.3d 352, 376 (3d Cir. 2012)). Thus, the Court considers whether the act would deter a person of ordinary firmness, not whether a specific plaintiff was deterred. *See id.* Thus, courts will not reward government officials for "'picking on unusually hardy speakers,'" nor should government officials "'be liable when the plaintiff is unreasonably weak-willed.'" *Id.* (quoting *Bennett v. Hendrix*, 423 F.3d 1247, 1252 (11th Cir. 2005)).

[7] In briefing, Plaintiff hints for the first time that Defendants engaged in a series of retaliatory behaviors, including the debate over the CNN Broadcast, the Solicitor's "thinly veiled threat to sue Mr. Detschelt for his political speech," and the issuance of the District Statement and Press Release in response to Detschelt's posting the meme. (Docket No. 11 at 12-13). However, these allegations, although mentioned (in part) as factual background in the Complaint, are not alleged therein to be retaliatory acts, nor is it clear to the Court, based on the Complaint as currently pled, how those allegations constitute retaliatory actions. (Docket No. 1).

13

(i.e. official speech), the Court must first determine whether this speech can amount to a retaliatory act before it can determine whether it could be sufficient to deter a person of ordinary firmness from exercising [his] constitutional rights."[8] *Caristo*, 370 F. Supp. 3d at 570 (citing *Mirabella*, 853 F.3d at 651 (when the alleged act of retaliation is the official's own speech, "we employ a more specific test to determine whether the official's speech amounts to a retaliatory act")). "Official speech will only constitute a retaliatory act if it is of a 'particularly virulent character.'" *Id.* at 571 (quoting *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001)). This standard is in place because public officials – here, Defendants Dr. Taylor and the School District – have their own countervailing First Amendment rights vis-a-vis Detschelt. *See id.* Under this test, the Court, considering the allegedly retaliatory speech at issue, asks "'whether there was a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow.'" (*Id.* (quoting *Mirabella*, 853 F.3d at 651 (additional quotation marks and citation omitted)).

The "virulent character" test only applies, however, "if the case involves a matter of public concern" and not if the official's conduct relates to a private matter, such as the job performance of a former employee. *Caristo*, 370 F. Supp. 3d at 571 (citing *Conard v. Pennsylvania State Police*, 902 F.3d 178 183 (3d Cir. 2018)). This limitation on the application of the "virulent character" test, sometimes called an exception, is important because "[p]ublic policies supporting the 'virulent character test,' such as public interest in having officials fulfill their duties (which may require public criticism), are not in play when the speech concerns a private matter." *Id.* (noting

---

[8] Defendants argue that this case "is not a typical First Amendment Retaliation case" because the action Detschelt is challenging (the District Statement) was made by Dr. Taylor and Detschelt's peers in the political arena, and the Statement was consistent with a "censure" that was later voted on and approved by a majority of Detschelt's fellow School Board Members. (Docket No. 9 at 12-18). Defendants assert that the censure is a critical fact that the Court should consider in determining whether Detschelt's First Amendment rights were violated. (*Id.* (citing in support of their argument a number of cases from the Court of Appeals for the Ninth Circuit, rather than cases from the Third Circuit). Detschelt, too, discusses the censure in his brief. (Docket No. 11 at 13-16). However, matters involving the censure are not alleged in the Complaint and the Court will not consider the censure on the present pleadings.

that, in *Conard*, the retaliatory speech involved false statements by a former public employer to a prospective employer in response to a reference request).  Here, however, Detschelt affirmatively pleads in his Complaint, and he argues in his opposition brief, that his plausibly averred speech involved a matter of public concern.  (Docket Nos. 1 at ¶ 46; 11 at 10). The Court agrees that both Detschelt's Meme and related posts, as well as the School District's counterstatements, are matters of public concern.   Therefore, the *Conard* exception does not apply, and Detschelt's claim for First Amendment retaliation is subject to the "virulent character" test.  *See Caristo*, 370 F. Supp. 3d at 572.

The specific language of the District Statement does not satisfy the virulent character test. In essence, the District Statement explained that the School District was made aware that Detschelt had posted the Meme and subsequent comments on Facebook containing the word "retard" that "many found . . . to be insensitive and offensive not only to our families of students with special needs, but to members of our school community," and conveyed that the School District "does not condone nor support the use of these terms in any capacity" and that Detschelt's postings "represent his personal views and do not represent, nor reflect, the views of the Norwin School District, the District Administration, or the Norwin Board of Education."  (Docket No. 1-5).  The Court finds that the District Statement, on its face, in no way communicates "a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow."[9] *Mirabella*, 853 F.3d at 651 (quoting *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001)). Accordingly, the Court concludes that the "'quantum of governmental authority brought to bear'"

---

[9] Detschelt submits that the facts alleged in the Complaint meet this standard because the District Statement "forewarned" Detschelt that he would face adverse disciplinary action, and shortly thereafter the Board issued the "censure" for conduct Detschelt committed as a private citizen. (Docket No. 11 at 16 n.7).  However, the Complaint does not allege that the District Statement forewarned Detschelt that he would face adverse disciplinary action. Further, as explained, *supra*, the censure referenced by the parties in briefing is also not part of the Complaint and will not be considered for purposes of ruling on Defendants' present motion to dismiss.

in the District Statement and Press Release is minimal. *Id.* (quoting *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 88 (3d Cir. 1984)).

Therefore, as Detschelt has failed to plausibly plead that Defendants engaged in a retaliatory act, the second element of a First Amendment retaliation claim, the Court need not consider the third element of such claim, whether a causal link has been pled. Accordingly, Detschelt's claim against Defendants will be dismissed for failure to state a claim upon which relief can be granted. Such dismissal will be without prejudice, however, and Detschelt will be given leave to amend his claim, should he choose to do so.

### B. Whether Dr. Taylor is Entitled to Qualified Immunity

Defendants also argue that Dr. Taylor is entitled to qualified immunity. Although the Court is dismissing Detschelt's Section 1983 claim against Defendants in its entirety for failing to state a claim upon which relief can be granted, the Court must still consider whether Dr. Taylor is entitled to qualified immunity here. *See Roth v. City of Hermitage*, 709 F. App'x 733, 736 (3d Cir. 2017) ("Failing to consider the qualified immunity defense before dismissing without prejudice on the merits was error because the District Court failed to resolve a motion asserting qualified immunity . . . at the earliest possible stage in the litigation." (internal quotation marks and citation omitted)). Defendants contend that Dr. Taylor is entitled to qualified immunity because his issuance of the District Statement was entirely consistent with an eventual public censure of Detschelt by the School District, the Statement did not deprive Detschelt of his First Amendment rights, and even if Detschelt does allege a violation of a constitutional right, that right was not clearly established at the time Dr. Taylor issued the Statement. (Docket No. 9 at 18). However, because Detschelt's claims are undeveloped at this time (as set forth above), because Defendants do not discuss this issue in their reply brief in response to Detschelt's opposition, and since

16

Detschelt is being given leave to amend his Complaint, the Court cannot now resolve qualified immunity but will address it only briefly at this time.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A federal right is clearly established for qualified immunity purposes if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Additionally, qualified immunity must be assessed in the context of each individual defendant's specific conduct, including "an analysis of the facts adduced concerning the conduct of the official" claiming immunity. *Griffin-El v. Beard*, 411 F. App'x 517, 519 (3d Cir. 2011) (quoting *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990)).

A Court may find that a government official is entitled to qualified immunity at the motion to dismiss stage if "(1) the facts alleged show the [official's] conduct did not violate a constitutional right, or (2) the right violated was not clearly established in light of the specific context of the case." *Taylor v. Rosa*, 856 F. App'x 376, 378 (3d Cir. 2021) (citing *Reedy v. Evanson*, 615 F.3d 197, 223–24 (3d Cir. 2010)). Thus, "qualified immunity should only be granted on a motion to dismiss when it is 'established on the face of the complaint.'" *Janowski v. City of N. Wildwood*, 259 F. Supp. 3d 113, 126 (D.N.J. 2017) (quoting *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006)).

Here, the facts alleged in the Complaint do not make clear that the conduct of Dr. Taylor did not violate a constitutional right (or that such right was not clearly established). Because the Complaint does not show that Dr. Taylor's actions did not violate a clearly established

constitutional right, dismissal on qualified immunity grounds is premature. *See Thomas*, 463 F.3d at 291 (noting that a dismissal based on qualified immunity will be upheld "'only when the immunity is established on the face of the complaint'" (quoting *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001))). Additionally, the Court is granting Detschelt leave to amend his claim. If Detschelt chooses to file an amended complaint, he should provide a more definite statement of his claims, and the specific right at issue here, so that the qualified immunity issue may be resolved expeditiously and without "subjecting the [i]ndividual [d]efendants who may be immune from suit to needless discovery and the other burdens of litigation." *Id.* at 299-301 (discussing the tension between the concept of notice pleading and the qualified immunity doctrine).

Accordingly, at this juncture, the Court will decline to grant Defendants' motion to dismiss the claim against Dr. Taylor based on grounds of qualified immunity. *See Debrew v. Auman*, 354 F. App'x 639, 642 (3d Cir. 2009) (vacating an order granting a motion to dismiss on qualified immunity grounds because the sparse complaint "failed to disclose whether the defendants' actions did not violate a clearly established constitutional right" and therefore "dismissal on qualified immunity grounds was premature" (citing *Thomas*, 463 F.3d at 291)); *see also Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) (cautioning against deciding qualified immunity without a developed factual record). However, given that the Court is granting Defendants' motion to dismiss Detschelt's claim on other grounds, Defendants are free to raise this qualified immunity argument, if appropriate, in response to an amended complaint if Detschelt chooses to re-allege his claim against Dr. Taylor.

### C. Punitive Damages

In moving to dismiss, Defendants argue that Detschelt's claim for punitive damages against the School District and Dr. Taylor in his official capacity must be dismissed with prejudice. In

response, Detschelt concedes that he cannot recover such punitive damages. Accordingly, to the extent Detschelt's claim seeks punitive damages against the School District and Dr. Taylor in his official capacity, that claim is dismissed with prejudice.

### IV. CONCLUSION

For the reasons stated, Defendants' motion to dismiss Detschelt's Complaint is **granted**. Detschelt's claim against Defendants is **dismissed without prejudice** pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, although such claim is **dismissed with prejudice** to the extent it seeks punitive damages against the School District and Dr. Taylor in his official capacity.

An appropriate Order follows.

Dated: December 20, 2024                    *s/ W. Scott Hardy*
                                            W. Scott Hardy
                                            United States District Judge

cc/ecf: All counsel of record