# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ALEXANDER DETSCHELT,      )
      )
      Plaintiff,      )
      )
      v.      )    Civil Action No. 23-1402
      )
NORWIN SCHOOL DISTRICT and      )
JEFFREY M. TAYLOR,      )
      )
      Defendants.      )

## MEMORANDUM OPINION

In the Amended Complaint filed in this matter, Plaintiff Alexander Detschelt ("Detschelt")[1] alleges, pursuant to 42 U.S.C. § 1983, that Defendants Norwin School District and Jeffrey M. Taylor (collectively, "Defendants") retaliated against him for engaging in protected speech in violation of the First Amendment of the Constitution of the United States.  (Docket No. 29). Presently before the Court is the "Motion to Dismiss of Defendants, Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure" and supporting brief (Docket Nos. 30, 31), Detschelt's response and brief in opposition (Docket Nos. 33, 34), and Defendants' reply brief (Docket No. 35).  For the following reasons, Defendants' motion to dismiss the Amended Complaint will be granted, and Detschelt's claim against Defendants will be dismissed without prejudice.

## I.    BACKGROUND

The Court presents an abbreviated version of the relevant facts as alleged in the Amended Complaint[2] and in the light most favorable to Detschelt.  Detschelt is a resident of Westmoreland

---

[1]    Detschelt was previously represented by counsel in this case.  However, after Defendants' first motion to dismiss was granted, Detschelt filed a motion to withdraw/substitute attorney.  (Docket No. 24).  After the Court held a status conference, Detschelt's attorneys were withdrawn as counsel, and Detschelt (who is also an attorney) was granted leave to proceed *pro se* in this matter.  (Docket Nos. 26-28).

[2]    Detschelt contends that this Court has subject matter over his constitutional claim pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  (Docket No. 29, ¶ 2).

County, Pennsylvania, and at all times relevant to the Complaint, was and is a duly elected member of the Norwin Board of Education (the "School Board" or the "Board"). (Docket No. 29, ¶ 4). Defendant Norwin School District (the "School District" or the "District") is a Pennsylvania municipal corporation, and at all times relevant to the Amended Complaint, the School District acted by and through its duly elected and appointed officials, including Defendant Dr. Jeffrey M. Taylor ("Dr. Taylor"). (*Id.* ¶ 5). Dr. Taylor is a resident of Allegheny County, Pennsylvania, and at all times relevant to the Amended Complaint, was the duly elected and commissioned Superintendent of the School District. (*Id.* ¶ 6).

As alleged in the Amended Complaint, during and prior to Detschelt's campaign for school board director, he vocally criticized in social and print media and at board meetings, Dr. Taylor, the School District administration, the School Board, and union leadership for their support and implementation of COVID-19 policies. (Docket No. 29, ¶ 9). On January 17, 2022, the School Board convened a public meeting, during which a contentious debate occurred between Dr. Taylor and Detschelt concerning the daily broadcast of CNN-10 (the "CNN Broadcast") during the homeroom period to all School District students. (*Id.* ¶ 10). Dr. Taylor supported showing the CNN Broadcast, while Detschelt opposed it. (*Id.*). On February 14, 2022, the School Board conducted a workshop meeting during which it passed a motion, advocated by Detschelt, prohibiting the CNN Broadcast. (*Id.* ¶ 11).

Shortly thereafter, Detschelt received national media coverage for playing a key role in removing the CNN Broadcast, while, according to the Amended Complaint, Dr. Taylor received criticism from the public as Superintendent because he was in charge of providing administrative oversight to the School District and because he had supported showing the CNN Broadcast. (Docket No. 29, ¶¶ 12, 13). In subsequent public meetings of the School Board, Detschelt, as a

member of the School Board's Policy Committee, discussed and recommended that the Board adopt an official policy that prevented teachers from discussing their personal political views in the classroom, and Dr. Taylor announced his dissatisfaction with Detschelt in later meetings.  (*Id.* ¶ 14).

During a School Board executive session on June 6, 2022, attorney Russell Lucas ("Lucas"), whose law firm was acting as the School District's Solicitor, distributed printouts of a judicial opinion issued in *Zurchin v. Ambridge Area School District*, 300 F. Supp. 3d 681 (W.D. Pa. 2018), in which the court found that a hostile work environment existed because of particular behaviors and comments that a school district's board of directors had made regarding a school administrator.[3]  (Docket No. 29, ¶ 15).  According to the Amended Complaint, Lucas brought *Zurchin* to the School Board's attention in reaction to prior comments, made by Detschelt and another School Board Director, that were critical of Dr. Taylor, with whom Lucas "shares political goals that are diametrically opposed to those of" Detschelt and the other School Director involved. (*Id.* ¶ 16).  The Amended Complaint avers that Lucas provided the *Zurchin* opinion to the School Board in an attempt to prevent Detschelt and his fellow School Board Director from voicing any further concerns or criticism of Dr. Taylor through fear, intimidation, and implicit coercion.  (*Id.* ¶ 17).  At the same meeting, Detschelt gave a presentation to the School Board in which he expressed the views and impressions that he had formed during the first six months of his term as a School Board Director, and Detschelt made statements and comments that were critical of Dr. Taylor and the School District Administration.  (*Id.* ¶ 18).

During an August 8, 2022, School Board meeting, Detschelt indicated that the Assistant Superintendent's son's college roommate was hired as a School District teacher, that nobody on

---

[3]        This characterization of *Zurchin* is based solely on the averments in the Amended Complaint and not on the actual opinion itself.

the School Board knew of this connection, and that the anti-nepotism policy being discussed at that meeting should be amended to require full disclosure of potential hires of friends and relatives of School District employees. (Docket No. 29, ¶ 19). At a School Board meeting on October 17, 2022, Detschelt and another School Board Director informed the Board that its Superintendent Evaluation was in violation of the School Code because the evaluation was unlawfully submitted without the feedback from the entire School Board. (*Id.* ¶ 20). At that same meeting, Detschelt made critical comments about the use of a book entitled "All Are Welcome" by the School District in an elementary school, stating that that book about inclusivity "neglects to differentiate between legal immigrants and foreign invaders." (*Id.* ¶ 21). As a result of these and other comments pertaining to such book, Detschelt made newspaper (print and online) appearances and public media appearances to discuss his criticism of the book and its use by the School District, causing Dr. Taylor to put out a statement that "Mr. Detschelt has not been authorized to speak on behalf of the District, the Board, or the Administration regarding this book or the District's program or curriculum." (*Id.* ¶ 22).

A few days later, on October 25, 2022,[4] Detschelt posted an image of a satirical Halloween costume package (the "Meme") on the Norwin Area Talk Facebook page, which Detschelt describes as a private community for "people to talk/vent without having to be politically correct." (Docket No. 29, ¶ 23). Detschelt posted the Meme with the message, "I call your Uncle Festerman and raise you with a virtue signaler," in apparent reference to another meme depicting then-senatorial candidate John Fetterman and referring to him as a "Supersized Slacker." (Docket No. 29 at 18-19). The Meme that Detschelt posted contained and displayed the phrase "[Expletive deleted] Retard," in reference to a person depicted with a "Medical Mask" and "Virtue Cape" who

---

[4]    The Court takes judicial notice that Pennsylvania's general election took place on November 8, 2022.

has had "3 [presumably Covid] Boosters" and has a "Sense of Superiority." (*Id.* at 18).

Shortly after posting the Meme, Detschelt removed it and posted the following message:

> Sorry if anyone was offended by my costume meme that was in the same light as the meme above [referencing the meme depicting Fetterman] except for the word "retard" in the costume description. It's a meme, that's all it was with no I'll [sic] intent, but I've removed it due to some people reaching out feeling strongly against it.

(Docket No. 29, ¶ 24; Docket No. 29 at 19). Later that day, Detschelt posted the following message

in another private Facebook group (a group called "Norwin 5 Days Strong!!!"):

> I need to clear up some nonsense that's been taken out of context (as is the case with most of the stuff I say or do). Earlier today I posted a "costume meme" in a different group after a similar "costume meme" (about Uncle Festerman) was posted, but the one I reposted contained the word "retard" in it. I didn't make the meme and my comment to the meme was regarding the virtue-signaling liberals that the costume would appeal to – "retard" was part of the meme and not something I would use in regular conversation. The screenshot that's been circulating is the one with just the meme that I posted, alone, so the context to why it was posted was missing.
>
> I don't take issue with words unless they are used in a direct offensive context and to me, they are still just words. However, a parent of a special needs child called me today and told me that although she doesn't see the meme as *me* saying something offensive via that meme, the word caused emotions to run through her because her son has been called retarded over the years by other kids. She indicated that other parents may also have a similar emotional reaction when seeing that word. Therefore, I took the post down.
>
> …but I still stand by the humor of the overall meme and hope it makes the libs "Reeeeeeeeee."

(Docket No. 29, ¶ 25; Docket No. 29 at 20).

In an email dated October 28, 2022, Dr. Taylor informed the School Board that he had drafted an official statement on behalf of the School District (the "District's Statement" or the "Statement"), and announced his intention to send the Statement to the "stakeholders" of the School District in order "to minimize misinformation being disseminated on social media." (Docket No. 29, ¶ 29). Also on that day, Dr. Taylor sent the Statement through the School

District's "e-Blast" email list to 7,713 stakeholders of the School District, including students, teachers, employees, administrators, Board of Education, Parents and Guardians, PTA, alumni, households in the district without children, local businesses and organizations, etc. (*Id.* ¶ 30). The District's Statement indicated as follows:

> Dear Norwin Families and School Community,
>
> As you may be aware, over the past week, a member of the Norwin Board of Education posted several comments on social media which have offended many employees and members of our school community.
>
> As advocates for all children, it is the District's responsibility to promote our Board-approved Mission, Vision, and Core Values. The mission of the Norwin School District is to provide a positive, learner-centered environment that supports the growth of all students. Our Core Values include: (1) "nurturing the health and well-being of students and relationships," and (2) "promoting a positive school climate and safe environment."
>
> In response to media inquiries about the posts, the District has shared an official statement. I am including a copy of the statement below for your information.
>
> Best regards,
>
> Dr. Jeff Taylor,
> Superintendent
>
> **<u>District Official Statement:</u>**
>
> The District was made aware of social media posts shared on Facebook by a member of the Norwin Board of Education, Mr. Alex Detschelt, containing the "R-word" and later edited to include the "Reee" phrase. The District recognizes that many found his posts to be insensitive and offensive not only to our families of students with special needs, but to members of our school community.
>
> The Norwin School District does not condone nor support the use of these terms in any capacity. While Mr. Detschelt spoke on his own behalf, it is important to note that his social media posts represent his personal views and do not represent, nor reflect, the views of the Norwin School District, the District Administration, or the Norwin Board of Education.
>
> The Norwin School District and the Norwin Board of Education do not believe in discrimination on the basis of handicap, disability, or political affiliation in its educational or employment programs and activities. We believe in

embracing empathy for all by promoting equality, diversity, and inclusivity.

The mission of the Norwin School District is to provide a positive, learner-centered environment that supports the growth of *all* students.

No further comment will be issued at present regarding this matter.

(Docket No. 29 at 23-24). Also on October 28, 2022, the School District issued a press release (the "Press Release"), which is substantially identical to the District's Statement. (Docket No. 29, ¶ 31; Docket No. 29 at 25).

At the November 7, 2022, School Board meeting, the School District via the School Board presented a motion for censure, and with majority vote passed the motion to censure Detschelt (the "School Board's Censure" or the "Censure") in his capacity as a member of the Board of School Directors. (Docket No. 29, ¶ 41). The Censure read as follows:

> Motion to censure Alex Detschelt in his capacity as a member of the Board of School Directors for the following reasons:
> (a) Mr. Detschelt has made comments which are not consistent with the District's core values, including comments criticizing diversity and comments offensive to people with disabilities; and
> (b) Mr. Detschelt has repeatedly failed to state that his views are not the views of the Norwin School Board, that he does not have the authority or permission to speak on behalf of the Board and that his views are his alone; and
> (c) Mr. Detschelt has used his District-provided email address to criticize and speak disrespectfully toward members of the public who have expressed their opposition to his views or their intention to speak against his views.
> Further, the Board calls on Mr. Detschelt to apologize to members of the community for his comments, both his offensive comments and his disrespectful comments made to members of the public, and to further make clear that statements made by him are not being made on behalf of the Board.

(Docket No. 29 at 26).

According to the Amended Complaint, Dr. Taylor and/or the School District devised, issued, and publicly released the District's Statement, and drafted and passed the School Board's Censure, in retaliation for Detschelt's: (1) prior criticism of School District policies and

instructional material; (2) prior public criticism of, and opposition to, Dr. Taylor's performance as Superintendent and the School District's Administration; and (3) repeated print, television/radio, and online media appearances where his criticisms of the School District and its administration were presented. (Docket No. 29, ¶ 45). Detschelt further alleges that Dr. Taylor and/or the School District devised, issued, and publicly released the District's Statement, and drafted and passed the Censure, which adversely affected Detschelt's protected speech as a private citizen and his ability to do his job as School Board Director:

> . . . making him far more reluctant to (1) criticize Dr. Taylor's performance as Superintendent or the School District Administration, (2) post potentially offensive political memes on Facebook, and (3) express himself in any manner, online or in person as a private citizen, under ongoing trepidation if such protected speech as a private citizen may result in being singled out by Dr. Taylor and/or the School District and being subjected to School District-initiated derision broadcast to a population at large.

(*Id.* ¶ 46). Detschelt avers that Dr. Taylor and/or the School District issued the Statement and passed the Censure for the sole purpose and effect of chilling and deterring Detschelt "from engaging in pure speech and expressive conduct" protected by the First Amendment, "activity such as criticizing the administrative regime of the School District or privately posting potentially offensive memes or using potentially offensive language on private Facebook pages that are nonetheless within the ambit of speech covered by the First Amendment." (*Id.* ¶ 48). Detschelt avers that the District's Statement and the Censure adversely affected his "protected speech as a private citizen and his ability to perform his job as School Board Director," *e.g.,* he received significant backlash from numerous "stakeholders" that included demands that he resign and express threats of physical violence on social media and messaging. (*Id.* ¶ 49).

In Count I, the sole Count of the Amended Complaint, Detschelt alleges that he spoke as a private citizen in his Facebook posts, and that – to the extent such speech was a *private matter* –

(1) his right to make non-threatening comments critical of Dr. Taylor's performance as Superintendent and the School District Administration's policies and instructional material, and (2) his right to post the word "retard," is free speech clearly established by law to be protected by the First Amendment at the time the Statement was released. (Docket No. 29, ¶¶ 56, 57). Detschelt avers that Defendants retaliated against him "as a private citizen" with the Statement and Censure with respect to his use of the word "retard." (*Id.* ¶ 57). Detschelt further avers that Defendants' conduct was sufficient to deter any reasonable person of ordinary firmness from exercising his or her constitutional rights and that that conduct, in fact, hindered Detschelt in his ability to engage in free speech, deterred him from exercising his rights to free speech in the future, and retaliated against him for exercising those rights in the past. (*Id.* ¶ 57).

Alternatively, Detschelt alleges that – to the extent his speech was a matter of *public concern* – he had the right to 1) make non-threatening comments critical of Dr. Taylor's work as Superintendent and the School District Administration, and 2) post a comment in a meme that was political but non-threatening in nature and nowhere near "hate speech," which constituted free speech that was clearly established by law to be protected by the First Amendment at the time Dr. Taylor released the District's Statement. (Docket No. 29, ¶ 58). Detschelt avers that Defendants retaliated against him, as a private citizen, with official speech that was of a particularly virulent character, specifically, that of intimidation, intimating that punishment, sanction, or regulatory action will follow, with such in fact occurring by virtue of the Statement and Censure. (*Id.*).

Defendants have filed their motion to dismiss the Amended Complaint, it has been fully briefed by the parties, and it is ripe for decision.

## II.    STANDARD OF REVIEW

### A.  Rule 12(b)(6)

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff, and the court must "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).  While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted)).  Moreover, while "this standard does not require 'detailed factual allegations,'" Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

It should be further noted, therefore, that in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  The standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  *Phillips*, 515 F.3d at

234 (quoting *Twombly*, 550 U.S. at 556).  Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted)).

To review a complaint under this standard, the Court proceeds in three steps.  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).  First, the Court notes the elements of a claim.  *See id.* (citing *Iqbal*, 556 U.S. at 675).  Second, the Court eliminates conclusory allegations.  *See id.* (citing *Iqbal*, 556 U.S. at 679).  And finally, the Court assumes the remaining well-pleaded facts are true and assesses "'whether they plausibly give rise to an entitlement to relief.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 679).

### B.  <u>Qualified Immunity</u>

The qualified immunity doctrine "shield[s] government officials performing discretionary functions . . . 'from liability [for] civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity is not a "mere defense to liability," but rather it is "an entitlement not to stand trial or face the other burdens of litigation."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  It is thus important to "resolv[e] immunity questions at the earliest possible stage in litigation."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).  In considering a claim of qualified immunity, a court must determine both whether the plaintiff has shown a violation of a constitutional right and whether the right was "clearly established" at the time of the alleged constitutional violation.  *See id.* (discussing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

### III.    <u>DISCUSSION</u>

Detschelt brings his constitutional claim pursuant to 42 U.S.C. § 1983, which does not create any substantive rights, but rather provides a remedy for deprivations of rights created by the Constitution of the United States or federal law.  *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985).  Thus, "[t]o state a claim for relief in an action brought under § 1983, [a plaintiff] must establish that [he was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."[5] *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  In this case, Detschelt asserts that Defendants violated his right to engage in free speech without retaliation under the First Amendment to the Constitution of the United States.

### A.    <u>First Amendment Retaliation</u>

To plead a plausible claim of First Amendment retaliation, a plaintiff must adequately allege that:  "(1) he engaged in 'constitutionally protected conduct,' (2) the defendant engaged in adverse retaliatory action 'sufficient to deter a person of ordinary firmness from exercising his constitutional rights,' and (3) there is "a causal link [ ] between the constitutionally protected conduct and the retaliatory action.'"  *Ruttle v. Brady*, No. 22-3000, 2023 WL 5554648, at *2 (3d Cir. Aug. 29, 2023) (quoting *Palardy v. Twp. of Millburn*, 906 F.3d 76, 80-81 (3d Cir. 2018) (citing *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)) (additional internal quotation marks omitted)); *see Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017).  Notably, the first element of a First Amendment retaliation claim concerns the plaintiff's conduct, while the second element concerns the defendant's conduct.  *See Caristo v. Blairsville-Saltsburg Sch. Dist.*, 370 F. Supp. 3d 554, 570-71 (W.D. Pa. 2019).

---

[5]    The parties do not appear to dispute that Dr. Taylor and the members of the School Board are state actors.

1.  **Allegations of Detschelt's Constitutionally Protected Conduct**

The Court notes, at the outset, that the allegations in the Amended Complaint are somewhat unclear and confusing, and at times certain allegations appear to overlap or contradict each other, but the Court makes every attempt to address the allegations logically and thoroughly herein.[6] After setting forth a lengthy recitation of background factual allegations in the Amended Complaint, Detschelt ultimately alleges that the constitutionally protected conduct that is specifically at issue in this case concerns his First Amendment freedom of speech rights to: (1) "make non-threatening comments that [were] critical of Dr. Taylor's performance as Superintendent and the School District Administration's policies and instructional material" (hereinafter, "School District criticism"); and (2) "post a political meme," or "post the word 'retard,'" which is "non-threatening in nature and nowhere near 'hate speech,'" (hereinafter, "Facebook posts"). (Docket No. 29, ¶¶ 57, 58). Detschelt further alleges that his Facebook posts were made in his capacity as a private citizen (*id.* ¶ 56), while his School District criticism appears to have been allegedly made in his official capacity as a School Board Director.[7]

Accordingly, the retaliation claim lodged in the Amended Complaint appears to be based on allegations of two different types of constitutionally protected speech: (1) Facebook posts allegedly made by Detschelt as a private citizen; and (2) School District criticism voiced by Detschelt in his official capacity as a School Board Director. For purposes of Defendants' motion

---

[6]     The Court notes, for instance, that it is at times unclear in the Amended Complaint when Detschelt is alleging that he was acting in his private capacity, and when he is alleging that he was acting in his official capacity. Additionally, Detschelt argues both that his speech was a matter of public concern and that his speech concerned a private matter.

[7]     For example, many of Detschelt's allegations concern his criticisms of the Superintendent/Administration that occurred during School Board meetings (Docket No. 29, ¶¶ 10-11, 14, 18-21) and/or concern his "proper statements and topics to bring before the Board because they were fair comments and criticism" that were "asserted in order to address issues that were exclusively related to the administration of school business" (*id.* ¶ 16).

to dismiss, the parties do not appear to dispute that such averments adequately allege constitutionally protected conduct, and the Court agrees. Therefore, the Court finds that the first element of Detschelt's First Amendment retaliation claim has been met.

### 2. Allegations of Defendants' Retaliatory Actions

As to the second element of Detschelt's First Amendment retaliation claim, the Amended Complaint alleges that Defendants' retaliatory conduct against Detschelt consisted of: (1) the release of the District's Statement, and (2) the passing of the School Board's Censure. (Docket No. 29, ¶¶ 57, 58). The parties dispute, however, whether Detschelt has adequately pled facts showing that such actions by Defendants – the District's Statement (its own official speech in response to Detschelt's speech) and the School Board's Censure (a decision by an elected body against one of its members) – were, in fact, retaliatory actions.

#### a. The District's Statement

First, the Court considers whether the facts alleged in the Amended Complaint show that the District's Statement, another form of speech, was a retaliatory action. "Because the alleged retaliatory conduct by [Defendants] is in the form of [its] own speech (i.e. official speech), the Court must first determine whether this speech can amount to a retaliatory act before it can determine whether it could be sufficient to deter a person of ordinary firmness from exercising [his] constitutional rights." *Caristo*, 370 F. Supp. 3d at 571 (citing *Mirabella*, 853 F.3d at 651 (explaining that when the alleged act of retaliation is the official's own speech, "we employ a more specific test to determine whether the official's speech amounts to a retaliatory act")). "Official speech will only constitute a retaliatory act if it is of a 'particularly virulent character.'" *Id.* (quoting *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001)). This standard is in place because public officials – here, Defendants Dr. Taylor and the School District – have their own

countervailing First Amendment rights vis-a-vis Detschelt. *See id.* Under this test, the Court, considering the allegedly retaliatory speech at issue, asks "'whether there was a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow.'" *Id.* (quoting *Mirabella*, 853 F.3d at 651 (additional internal quotation marks and citation omitted)).

The "virulent character" test only applies, however, "if the case involves a matter of public concern" and not if the official's conduct relates to a matter of only private concern. *Caristo*, 370 F. Supp. 3d at 571 (citing *Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018)). This limitation on the application of the "virulent character" test, sometimes called an exception, is important because "[p]ublic policies supporting the 'virulent character test,' such as public interest in having officials fulfill their duties (which may require public criticism), are not in play when the speech concerns a private matter." *Id.* Generally, "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community . . . or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks and citations omitted).

In considering Defendants' motion to dismiss the original Complaint, the Court previously found that Detschelt's plausibly averred speech involved a matter of public concern – a conclusion that the parties did not dispute. Therefore, the Court previously held that, under the facts averred in the Complaint, the *Conard* exception did not apply to this case, and Detschelt's claim for First Amendment retaliation was subject to the "virulent character" test. *See Caristo*, 370 F. Supp. 3d at 571-52. Now, however, in opposing Defendants' motion to dismiss the Amended Complaint (presumably in an attempt to avoid the application of the virulent character test), Detschelt argues – somewhat confusingly, and in the alternative – that his constitutionally protected speech

concerned a "private matter" *or* that his speech was a "matter of public concern" (although, in making such assertion, he does not differentiate between the two types of constitutionally protected speech that he alleges).[8]  (Docket No. 29, ¶¶ 57, 58).

Detschelt does not make his alternative public/private concern argument regarding his School District criticism, however, and he appears to concede that his School District criticism is a matter of public concern.  Therefore, for purposes of ruling on Defendants' present motion to dismiss and based on the allegations in the Amended Complaint, the Court finds (as it previously found in considering Defendants' first motion to dismiss) Detschelt's School District criticism, made in his official capacity, to be a matter of public concern.  Thus, to the extent the District's Statement is considered to be speech in response to Detschelt's School District criticism, the virulent character test applies.

Similarly, with regard to his Facebook posts, Detschelt previously argued (in opposing Defendants' motion to dismiss his original Complaint) that such posts were a matter of public concern and were thus protected by the First Amendment – while Defendants did not explicitly agree.[9]  Nevertheless, viewing Detschelt's allegations in the Complaint in the light most favorable to him for purposes of considering Defendants' motion to dismiss, the Court found that Detschelt plausibly alleged protected speech in his Facebook posts that was a matter of public concern.  In so finding, the Court noted that such posts (which contained the words "retard" and "Reee") included a meme of Senator Fetterman and referred critically to Covid-related measures and "liberals" shortly before an election for which Fetterman was on the ballot.  (Docket Nos. 1-1, 1-2,

---

[8]        In his original Complaint, Detschelt alleged that his speech related directly to and involved matters of public concern, and the Court agreed.  (Docket No. 1, ¶ 46).

[9]        *See* Docket No. 9 at 12 ("Setting aside the issue of whether Plaintiff's pejorative reference to a "[Expletive deleted] Retard" was protected by the First Amendment . . . .").

1-3).    Accordingly, the Court found that in considering Defendants' speech in response to Detschelt's Facebook posts, the virulent character test applies. Here, too, to the extent Detschelt pleads in his Amended Complaint that his Facebook posts are a matter of public concern, the Court finds that in considering the District's Statement as speech in response thereto, the virulent character test applies.

However, in response to Defendants' second motion to dismiss, Detschelt now also argues (in the alternative) that his protected speech was a *private matter*, despite the fact that the Amended Complaint contains no new allegations regarding the Facebook posts. Instead of amending his averments, Detschelt presents a new argument as to how the Court should evaluate the same Facebook post allegations, which is, in essence, that Defendants' response to Detschelt's Facebook posts "made" those posts a private matter. (Docket No. 29, ¶ 42). Specifically, Detschelt concedes that his Facebook posts "taken as a whole" were "political in nature," but he now argues that Defendants "focused on just one word [retard] that had no political connotation or sentiment, with the District's retaliatory actions relating only on that word." (Docket No. 34 at 3). Detschelt contends that Defendants focused too much on the use of the word "retard" in responding to his Facebook posts, and "failed to provide its own political speech as a countervailing viewpoint." (*Id.* at 4). Detschelt suggests various responses that Defendants could have provided in response to his Facebook posts, which would have contained an explicitly political message. (*Id.*). Detschelt asserts that, since Defendants did not respond in such a manner, however, the word "retard" (and the accompanying "Reee" phrase) should be considered in isolation without the surrounding context of his admittedly political posts, and the use of such word(s) should be found *not* to constitute speech that is a matter of public concern.[10] (*Id.* at 4-5).

---

[10]    In the Amended Complaint itself, Detschelt avers that "[a]lthough the Meme as a whole is of a political nature and thus considered a matter of public concern on its face," Defendants' response focusing on "the word 'retard,'

The Court disagrees.  Previously, based on the allegations in the Complaint and for the reasons set forth in its Memorandum Opinion granting Defendants' prior motion to dismiss, the Court found Detschelt's Facebook posts to be a matter of public concern – as Detschelt also urged at that time.  The allegations regarding Detschelt's Facebook posts have not changed in the Amended Complaint.  Additionally, Detschelt has provided no legal support for his argument that the Court should consider only one word from the Facebook posts, in isolation and while discarding the surrounding context, in order to find that such posts did not involve a matter of public concern.  The Court is not persuaded that Defendants, in choosing not to respond to the entirety of Detschelt's Facebook posts (which were admittedly of public concern) with "countervailing political speech," and instead electing to indicate that they did not agree with certain language that Detschelt used in his Facebook posts (and to clarify that Detschelt did not speak for the School District in such posts), thereby "made" Detschelt's speech a private matter, as Detschelt now argues.

Moreover, the Court notes that to the extent Detschelt argues that the *Conard* exception does not apply here – and that the virulent character test should therefore not be applied – based on his allegation (in the alternative) that his Facebook posts involve a "private matter," the Court also disagrees.  The type of concern regarding private matters that was raised in *Conard* is simply not present here, under the facts alleged in the Amended Complaint.  In *Conard*, the private matter at issue – which merited an exception to the application of the virulent character test – was the plaintiff's job performance as a former employee, and the retaliatory speech was in the form of false statements by a former public employer to the plaintiff's prospective employer in response

---

without further context, thereby mak[es] Mr. Detschelt's instant speech non-political and a private matter (i.e., not a matter of public concern, no different than had he used any other English word by itself and without a political meme associated with it)."  (Docket No. 29, ¶ 42).

to a reference request.  *See* 902 F.3d at 182-83.  Other examples of speech that have been found to be of only private concern include:  information about a particular individual's credit report that was available only to five subscribers who could not disseminate it further, *see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761-62 (1985); and in the context of a government employer regulating the speech of its employees, videos of an employee engaging in sexually explicit acts, *see San Diego v. Roe*, 543 U.S. 77, 84 (2004).  Detschelt's Facebook posts, and the District's Statement issued in response thereto, do not appear to raise concerns like those raised in connection with other types of matters that have been found to be "private."  Whether Detschelt's posts are viewed widely as criticism of a response to Covid, or narrowly viewed as focusing on a certain word considered hurtful to a portion of the School Board's and District's constituents, such concerns are public, not private.  Thus, Detschelt has not shown that his Facebook posts involve a purely private matter, such that the "virulent character" test should not be applied to the School District's response thereto.

Accordingly, as the Court previously found in ruling on Defendants' first motion to dismiss, the Court finds, here again and based on the same allegations, that the specific language of the District's Statement does not satisfy the virulent character test.  In essence, the District's Statement explained that the School District was made aware that Detschelt had posted the Meme and subsequent comments on Facebook containing the word "retard" that "many found . . . to be insensitive and offensive not only to our families of students with special needs, but to members of our school community," and conveyed that the School District "does not condone nor support the use of these terms in any capacity" and that Detschelt's postings "represent his personal views and do not represent, nor reflect, the views of the Norwin School District, the District Administration, or the Norwin Board of Education."  (Docket No. 29 at 23-24).  The Court finds,

19

in considering the allegations of the Amended Complaint, that the District's Statement, on its face, in no way communicates "'a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow.'" *Mirabella*, 853 F.3d at 651 (quoting *McLaughlin*, 271 F.3d at 573). The only reasonable reading of the Statement is that the District was disassociating itself from that language used by Detschelt, who made the posts without the collective endorsement of the School Board as a whole. Accordingly, the Court concludes that the "'quantum of governmental authority brought to bear'" in the District's Statement is minimal. *Id.* (quoting *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 88 (3d Cir. 1984)). Thus, the Court finds that Detschelt has failed to plausibly plead that the District's Statement constituted a retaliatory action against him by Defendants.

### b. **The School Board's Censure**

The Court next considers whether the facts alleged in the Amended Complaint plausibly show that the School Board's Censure of Detschelt constituted a retaliatory action by Defendants.[11] As set forth, *supra*, the language of the Censure (quoted in part in the Amended Complaint, and attached in full thereto as a "Motion to censure Alex Detschelt in his capacity as a member of the Board of School Directors for the following reasons") expressly indicated that: Detschelt had made comments "not consistent with the District's core values, including comments criticizing diversity and comments offensive to people with disabilities"; he had repeatedly failed to state that his views are not the views of the School Board; he had used his District-provided email address to criticize and speak disrespectfully toward members of the public; and the Censure called for

---

[11] Although the Censure was not specifically listed as a retaliatory action in the original Complaint, both Detschelt and Defendants discussed the Censure at length in their briefs in support of and in opposition to Defendants' first motion to dismiss. Additionally, Defendants argue repeatedly that the Censure is substantially the same as the District Statement and should be treated similarly. Therefore, for purposes of ruling on Defendants' present motion to dismiss, the Court finds that the allegations regarding the Censure in the Amended Complaint relate back to the date of the original Complaint, and the Court does not find such additional allegations regarding the Censure, as part of Defendants' alleged retaliation against Detschelt, to be time-barred. *See* Fed. R. Civ. P. 15(c).

Detschelt to apologize to members of the community for his comments and to make clear that statements made by him are not made on behalf of the School Board. (Docket No. 29 at 26). Detschelt asserts, without providing legal support, that the Censure "was a regulatory action, created by a governing body, namely, the majority of the members of the District's school board, was acted upon at a legislative meeting of the District as an agenda item, . . . passed by a majority vote . . . which by any objective measure qualifies as an adverse regulatory action (or sanction)." (Docket No. 34 at 11).

A recent Third Circuit case, *Ruttle v. Brady*, No. 22-3000, 2023 WL 5554648 (3d Cir. Aug. 29, 2023), addressed whether a First Amendment retaliation claim could be sustained where a censure was alleged to be an adverse retaliatory action. The plaintiff in *Ruttle*, a borough council member, alleged a First Amendment retaliation claim against his fellow council members and the borough, based on a council censure that he received after objecting to a council resolution. *See id.* at *1. The Third Circuit affirmed the district court's determination that the censure at issue did not constitute an adverse retaliatory action, relying on the Supreme Court's decision in *Houston Community College System v. Wilson*, 595 U.S. 468, 479 (2022). In *Houston Community*, the Supreme Court reversed the appellate court and found that a college board of trustees' censure of one of its members, after years of acrimony, did not qualify as a materially adverse action consistent with the Court's case law. Citing *Houston Community*, the *Ruttle* Court stated, "The Supreme Court recently held that a verbal censure of a public official unaccompanied by any punishment, like the one at issue here, is not an 'adverse' retaliatory action that can form the basis of a First Amendment claim." 2023 WL 555648, at *3 (citing *Houston Community*, 595 U.S. at 477-79). The *Ruttle* Court further noted that, in *Houston Community*, the Supreme Court explained that "'[i]n this country, we expect elected representatives to shoulder a degree of criticism about

their public service from their constituents and their peers—and to continue exercising their free speech rights when the criticism comes.'"[12]  *Id.* (quoting *Houston Community*, 595 U.S. at 478). The *Ruttle* Court remarked that the censure at issue in that case, like the censure in *Houston Community*, involved "'a censure of one member of an elected body by other members of the same body,'" and concluded that because the censure "'[did] not involve expulsion, exclusion, or any other form of punishment,'" similar to the censure at issue in *Houston Community*, such censure could not support a viable First Amendment claim.  *Id.* (quoting *Houston Community*, 595 U.S. at 482)

Here, too, the Court notes that, based on the allegations of the Amended Complaint, and like the censures at issue in *Houston Community* and *Ruttle*, the School Board's Censure was issued against Detschelt in his official capacity by his fellow School Board members – *i.e.,* against one member of an elected body by other members of the same body.  Additionally, like the censures in *Houston Community* and *Ruttle*, the School Board's Censure here did not involve expulsion, exclusion, or any other form of punishment.  As such, the Court finds that, as the

---

[12]    Justice Gorsuch authored the *Houston Community* opinion, further noting that "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that it was adopted in part to protect the free discussion of governmental affairs," and "[w]hen individuals consent to be a candidate for a public office conferred by the election of the people, they necessarily pu[t] [their] character in issue, so far as it may respect [their] fitness and qualifications for the office."  595 U.S. at 478 (internal quotation marks and citations omitted).  Justice Gorsuch continued:

> The First Amendment surely promises an elected representative like [plaintiff] the right to speak freely on questions of government policy.  But just as surely, it cannot be used as a weapon to silence other representatives seeking to do the same.  The right to "examin[e] public characters and measures" through "free communication" may be no less than the "guardian of every other right."  Madison's Report on the Virginia Resolutions (Jan. 7, 1800), in 17 Papers of James Madison 345 (D. Mattern, J. Stagg, J. Cross, & S. Perdue eds. 1991).  And the role that elected officials play in that process "'makes it all the more imperative that they be allowed to freely express themselves.'"  *Republican Party of Minn. v. White*, 536 U.S. 765, 781, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002).

*Id.*
In other words, a public figure must "take it" just as well as they "give it."  And, here, what the School District gave back to Detschelt seems to have been mild indeed.

Supreme Court concluded in *Houston Community* and the Third Circuit held in *Ruttle* when considering censures, the Board's Censure here does not constitute an adverse retaliatory action and cannot support a viable First Amendment claim.

      **c.**  <u>**Summary**</u>

Detschelt has failed to plausibly plead that, through the issuance of the District's Statement or the passing of the School Board's Censure, Defendants engaged in retaliatory actions necessary to satisfy the second element of a First Amendment retaliation claim.  Therefore, the Court need not consider the third element of such claim, whether a causal link has been pled.  Accordingly, Detschelt's claim against Defendants will be dismissed for failure to state a claim upon which relief can be granted.  Such dismissal will be without prejudice, however, and Detschelt will be given one final opportunity to amend his claim, should he choose to do so.

      **B.**  <u>**Whether Dr. Taylor is Entitled to Qualified Immunity**</u>

As in their previous motion to dismiss, Defendants again argue, in moving to dismiss the Amended Complaint, that Dr. Taylor is entitled to qualified immunity in this matter.  Although the Court is once again dismissing Detschelt's Section 1983 claim against Defendants for failure to state a claim upon which relief can be granted, the Court will again consider here whether Dr. Taylor is entitled to qualified immunity.  *See Roth v. City of Hermitage*, 709 F. App'x 733, 736 (3d Cir. 2017) ("Failing to consider the qualified immunity defense before dismissing without prejudice on the merits was error because the District Court failed to resolve a motion asserting qualified immunity . . . at the earliest possible stage in the litigation." (internal quotation marks and citation omitted)).

Defendants contend that Dr. Taylor is entitled to qualified immunity because the District's Statement in no way communicates a threat, coercion, or intimidation, intimating that punishment,

sanction, or adverse regulatory action will follow; Detschelt has not pled any specific facts against Dr. Taylor relative to his involvement in the School Board's Censure of Detschelt, which used substantially similar language to the District Statement; and the Supreme Court has held that a legislative body's censure of one of its members is not a retaliatory act for purposes of First Amendment retaliation.  (Docket No. 31 at 16).  However, because Detschelt's claims remain undeveloped at this time (as set forth above), because Defendants do not further discuss this issue in their reply brief in response to Detschelt's opposition to their motion, and since Detschelt shall be permitted one final opportunity to amend his claim, the Court cannot now resolve qualified immunity, and will address it only briefly here.

As the Court previously explained in ruling on Defendants' motion to dismiss the Complaint, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A federal right is clearly established for qualified immunity purposes if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  Additionally, qualified immunity must be assessed in the context of each individual defendant's specific conduct, including "'an analysis of the facts adduced concerning the conduct of the official'" claiming immunity.  *Griffin-El v. Beard*, 411 F. App'x 517, 519 (3d Cir. 2011) (quoting *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990)).

A Court may find that a government official is entitled to qualified immunity at the motion to dismiss stage if "(1) the facts alleged show the [official's] conduct did not violate a constitutional right, or (2) the right violated was not clearly established in light of the specific context of the

case." *Taylor v. Rosa*, 856 F. App'x 376, 378 (3d Cir. 2021) (citing *Reedy v. Evanson*, 615 F.3d 197, 223–24 (3d Cir. 2010)).  Thus, "qualified immunity should only be granted on a motion to dismiss when it is 'established on the face of the complaint.'"  *Janowski v. City of N. Wildwood*, 259 F. Supp. 3d 113, 126 (D.N.J. 2017) (quoting *Thomas v. Independence Twp.*, 463 F.3d 285, 291 (3d Cir. 2006)).

Here, the facts alleged in the Amended Complaint do not make clear that the conduct of Dr. Taylor did not violate a constitutional right (or that such right was not clearly established). Because the Amended Complaint does not show that Dr. Taylor's actions did not violate a clearly established constitutional right, dismissal on qualified immunity grounds is still premature at this juncture.  *See Thomas*, 463 F.3d at 291 (noting that a dismissal based on qualified immunity will be upheld "'only when the immunity is established on the face of the complaint'" (quoting *Leveto v. Lapina*, 258 F.3d 156, 161 (3d Cir. 2001))).  Additionally, the Court is granting Detschelt leave to amend his claim one last time.  If Detschelt chooses to file a second amended complaint, he should provide a more definite statement of his claim, and the specific right at issue here, so that the qualified immunity issue may be resolved expeditiously and without "subjecting the [i]ndividual [d]efendants who may be immune from suit to needless discovery and the other burdens of litigation."  *Id.* at 299-301 (discussing the tension between the concept of notice pleading and the qualified immunity doctrine).

Accordingly, at this time, the Court will decline to grant Defendants' motion to dismiss the claim against Dr. Taylor based on grounds of qualified immunity.  *See Debrew v. Auman*, 354 F. App'x 639, 642 (3d Cir. 2009) (vacating an order granting a motion to dismiss on qualified immunity grounds because the sparse complaint "failed to disclose whether the defendants' actions did not violate a clearly established constitutional right" and therefore "dismissal on qualified

immunity grounds was premature" (citing *Thomas*, 463 F.3d at 291)); *see also Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) (cautioning against deciding qualified immunity without a developed factual record). However, given that the Court is granting Defendants' motion to dismiss Detschelt's claim on other grounds, Defendants are free to raise this qualified immunity argument, if appropriate, in response to a second amended complaint if Detschelt chooses to re-allege his claim against Dr. Taylor.

## IV.    **CONCLUSION**

For the reasons stated, Defendants' motion to dismiss Detschelt's Amended Complaint is **granted**. Detschelt's claim against Defendants is **dismissed without prejudice** pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

An appropriate Order follows.


Dated: May 29, 2025                            *s/ W. Scott Hardy*
                                               W. Scott Hardy
                                               United States District Judge


cc/ecf:  All counsel of record
         Alexander Detschelt

26