# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEXANDER DETSCHELT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 23-1402 |
| | ) | |
| NORWIN SCHOOL DISTRICT and | ) | |
| JEFFREY M. TAYLOR, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Plaintiff Alexander Detschelt's Third Amended Complaint (Docket No. 41) marks his fourth[1] attempt to plead cognizable claims against Defendants Norwin School District (the "School District" or the "District") and its Superintendent, Dr. Jeffrey M. Taylor ("Dr. Taylor") (collectively, "Defendants"). Therein, Detschelt realleges a claim, pursuant to 42 U.S.C. § 1983, that the School District and Dr. Taylor retaliated against him for engaging in protected speech in violation of the First Amendment of the United States Constitution. Detschelt also alleges, for the first time, that Defendants committed the tort of false light invasion of privacy under Pennsylvania

---

[1] Detschelt's Complaint (Docket No. 1) and Amended Complaint (Docket No. 29) were previously dismissed for failure to state cognizable claims, yet he was given leave each time to amend his pleadings. (Docket Nos. 22, 23, 36, 37). Detschelt then filed his Second Amended Complaint (Docket No. 38), but shortly thereafter filed a motion to amend it for "inadvertently" failing to include Dr. Taylor as a party in that pleading (Docket No. 39). The Court granted that motion, permitting Detschelt to file yet another amended pleading, his fourth, which led to his Third Amended Complaint (Docket No. 41). Detschelt was also previously represented by counsel in this case. However, after Defendants' first motion to dismiss was granted, Detschelt filed a motion to withdraw/substitute attorney (Docket No. 24). Then, after the Court held a status conference, Detschelt's attorneys were permitted to withdraw as counsel, and Detschelt (who is also an attorney) was granted leave to proceed *pro se* in this matter. (Docket Nos. 26-28). The Court takes note that the Pennsylvania Disciplinary Board's publicly searchable database indicates that Detschelt's status is "retired." *See* https://www.padisciplinaryboard.org/for-the-public/find-attorney/attorney-detail/89043 (Last visited Aug. 10, 2026). While the Court provides Detschelt the grace afforded to *pro se* litigants by having granted him leave to amend his pleadings multiple times pursuant to Third Circuit authority, *see Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2 (Nov. 28, 2022) (citing *Grayson v. Mayview Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)), that grace has its limits, especially here where the plaintiff had been a licensed attorney.

common law.  Presently before the Court is Defendants' Motion to Dismiss Plaintiff's Third Amended Complaint, Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Motion") and supporting brief (Docket Nos. 42, 43), Detschelt's response and brief in opposition (Docket Nos. 45, 46), and Defendants' reply brief (Docket No. 47).

The essence of this case involves social media posts and related commentary made by Detschelt, and the responding public Statement issued by the School District and subsequent Censure of Detschelt adopted by vote of the District's School Board. As explained more fully herein, the public Statement and Censure responding to Detschelt's own statements regarding matters of public concern were not unconstitutionally retaliatory as a matter of law. Detschelt's now-fourth attempt at stating a cognizable First Amendment Retaliation claim fails, once again, because his allegations simply reflect disagreements in the public square and not an instance where government officials respond to a citizen's speech in a virulent way with threats, coercion, or intimidation, or otherwise intimate that punishment, sanction or adverse regulatory action will follow. Accordingly, Detschelt's First Amendment claim at Count I will be dismissed with prejudice.  The Court will decline to exercise supplemental jurisdiction over Detschelt's remaining tort claim at Count II, which will be dismissed without prejudice so that Detschelt may pursue such claim in state court to the extent it would be cognizable and timely. Therefore, Defendants' Motion will be granted in part and denied in part.

## I.   BACKGROUND

The Court presents herein an abbreviated version of the relevant facts as alleged in the Third Amended Complaint[2] and in the light most favorable to Detschelt.  Detschelt, a resident of Westmoreland County, Pennsylvania, was at all relevant times one of the elected Directors of the

---

[2]   Detschelt seeks to implicate this Court's subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367. (Docket No. 41, ¶ 2).

District's School Board (the "School Board" or the "Board").  (Docket No. 41, ¶¶ 4, 6).  The School District is a Pennsylvania municipal corporation that acted by and through its duly elected and appointed officials, including Dr. Taylor, who at all relevant times was its duly elected and commissioned Superintendent.  (*Id.* ¶¶ 5, 7).  Dr. Taylor is a resident of Allegheny County, Pennsylvania.  (*Id.* ¶ 7).

As alleged in the Third Amended Complaint, during and prior to Detschelt's campaign for School Board Director, he vocally criticized in social and print media and at Board meetings Dr. Taylor, the School District administration, the School Board, and the District's union leadership for their support and implementation of COVID-19 policies.  (Docket No. 41, ¶ 9).  Detschelt was elected, and he commenced his four-year term as a Director in December 2021.  (*Id*. ¶ 6). Then, on January 17, 2022, the School Board convened a public meeting, in which a contentious debate occurred between Dr. Taylor and Detschelt, now an elected Director, concerning the daily broadcast of CNN-10 (the "CNN Broadcast") to all School District students during their homeroom period.  (*Id.* ¶ 10).  Dr. Taylor supported showing the CNN Broadcast, while Detschelt opposed it.  (*Id.*).  On February 14, 2022, the School Board conducted a workshop meeting during which it passed a motion, advocated by Detschelt, prohibiting the CNN Broadcast.  (*Id.* ¶ 11).

Detschelt received national media coverage for playing a key role in removing the CNN Broadcast, while, according to the Third Amended Complaint, Dr. Taylor received criticism from the public as Superintendent because he provided administrative oversight to the School District and had supported the CNN Broadcast.  (Docket No. 41, ¶ 11).  In subsequent public meetings of the School Board, Detschelt, as a member of the School Board's Policy Committee, discussed and recommended that the Board adopt an official policy that prevented teachers from discussing their personal political views in the classroom, and Dr. Taylor announced his dissatisfaction with

Detschelt in later meetings.  (*Id.* ¶ 12).

During a School Board executive session on June 6, 2022, attorney Russell Lucas ("Lucas"), whose law firm was acting as the School District's Solicitor, distributed printouts of a judicial opinion issued in *Zurchin v. Ambridge Area School District*, 300 F. Supp. 3d 681 (W.D. Pa. 2018), in which that court found that a hostile work environment existed because of particular behaviors and comments that a school district's board of directors had made regarding a school administrator.[3]   (Docket No. 41, ¶ 13).   According to the Third Amended Complaint, Lucas brought *Zurchin* to the School Board's attention in reaction to prior comments made by Detschelt and another School Board Director that were critical of Dr. Taylor, with whom Lucas "shares political goals that are diametrically opposed to those of" Detschelt and the other School Board Director involved.  (*Id.*).  Detschelt avers that Lucas provided the *Zurchin* opinion to the School Board to prevent Detschelt and his fellow School Board Director from voicing any further concerns or criticism of Dr. Taylor through fear, intimidation, and implicit coercion.  (*Id.*).  At the same meeting, Detschelt gave a presentation to the School Board in which he expressed the views and impressions that he had formed during the first six months of his term as a School Board Director and, in doing so, Detschelt made comments that were critical of Dr. Taylor and the School District Administration.  (*Id.* ¶ 14).

Then, during an August 8, 2022, School Board meeting, Detschelt indicated that the Assistant Superintendent's son's college roommate was hired as a School District teacher, that nobody on the School Board knew of this connection, and that the anti-nepotism policy being discussed at that meeting should be amended to require full disclosure of potential hires of friends and relatives of School District employees. (Docket No. 41, ¶ 15).  At a School Board meeting on

---

[3]      This characterization of *Zurchin* is based solely on the averments in the Third Amended Complaint and not on the actual opinion itself.

4

October 17, 2022, Detschelt and another School Board Director informed the Board that its Superintendent Evaluation was in violation of the School Code because the evaluation was unlawfully submitted without the feedback from the entire School Board.  (*Id.* ¶ 16).  At that same meeting, Detschelt made critical comments about the use of a book entitled "All Are Welcome" by the School District in an elementary school, stating that that book about inclusivity "neglects to differentiate between legal immigrants and foreign invaders."  (*Id.* ¶ 17).  As a result of these and other comments pertaining to such book, Detschelt made newspaper (print and online) appearances and public media appearances to discuss his criticism of the book and its use by the School District, causing Dr. Taylor to put out a statement that "Mr. Detschelt has not been authorized to speak on behalf of the District, the Board, or the Administration regarding this book or the District's program or curriculum."  (*Id.* ¶ 18).

A few days later, on October 25, 2022,[4] Detschelt posted an image of a satirical Halloween costume package (the "Meme") on the Norwin Area Talk Facebook page, which Detschelt describes as a private community for "people to talk/vent without having to be politically correct." (Docket No. 41, ¶ 19).  Detschelt posted the Meme with the message, "I call your Uncle Festerman and raise you with a virtue signaler," in apparent reference to another meme depicting then-senatorial candidate John Fetterman and referring to him as a "Supersized Slacker."  (Docket No. 41-1 at 1-2).  The Meme that Detschelt posted contained and displayed the phrase "[Expletive deleted] Retard," in reference to a person depicted with a "Medical Mask" and "Virtue Cape" who has had "3 [presumably Covid] Boosters" and has a "Sense of Superiority."  (*Id.* at 1).

Shortly after posting the Meme, Detschelt removed it and posted the following message:

> Sorry if anyone was offended by my costume meme that was in the same light
> as the meme above [referencing the meme depicting Fetterman] except for the
> word "retard" in the costume description.  It's a meme, that's all it was with no

---

[4]    The Court takes judicial notice that Pennsylvania's general election took place on November 8, 2022.

> I'll [sic] intent, but I've removed it due to some people reaching out feeling strongly against it.

(Docket No. 41, ¶ 20; Docket No. 41-1 at 2).  Later that day, Detschelt posted the following message in another private Facebook group (a group called "Norwin 5 Days Strong!!!"):

> I need to clear up some nonsense that's been taken out of context (as is the case with most of the stuff I say or do). Earlier today I posted a "costume meme" in a different group after a similar "costume meme" (about Uncle Festerman) was posted, but the one I reposted contained the word "retard" in it. I didn't make the meme and my comment to the meme was regarding the virtue-signaling liberals that the costume would appeal to – "retard" was part of the meme and not something I would use in regular conversation. The screenshot that's been circulating is the one with just the meme that I posted, alone, so the context to why it was posted was missing.

> I don't take issue with words unless they are used in a direct offensive context and to me, they are still just words. However, a parent of a special needs child called me today and told me that although she doesn't see the meme as *me* saying something offensive via that meme, the word caused emotions to run through her because her son has been called retarded over the years by other kids. She indicated that other parents may also have a similar emotional reaction when seeing that word. Therefore, I took the post down.

> …but I still stand by the humor of the overall meme and hope it makes the libs "Reeeeeeeeee."

(Docket No. 41, ¶ 21; Docket No. 41-1 at 3).

In an email dated October 28, 2022, Dr. Taylor informed the School Board that he had drafted an official statement on behalf of the School District (the "District's Statement" or the "Statement") and announced his intention to send the Statement to the "stakeholders" of the School District in order "to minimize misinformation being disseminated on social media." (Docket No. 41, ¶ 25).  Also on that day, Dr. Taylor sent the Statement through the School District's "e-Blast" email list to 7,713 stakeholders of the School District, including students, teachers, employees, administrators, Board of Education, Parents and Guardians, PTA, alumni, households in the district without children, local businesses, organizations, etc.  (*Id.* ¶ 26).  The District's Statement stated:

Dear Norwin Families and School Community,

As you may be aware, over the past week, a member of the Norwin Board of Education posted several comments on social media which have offended many employees and members of our school community.

As advocates for all children, it is the District's responsibility to promote our Board-approved Mission, Vision, and Core Values. The mission of the Norwin School District is to provide a positive, learner-centered environment that supports the growth of all students. Our Core Values include: (1) "nurturing the health and well-being of students and relationships," and (2) "promoting a positive school climate and safe environment."

In response to media inquiries about the posts, the District has shared an official statement. I am including a copy of the statement below for your information.

Best regards,

Dr. Jeff Taylor,
Superintendent

**District Official Statement:**

The District was made aware of social media posts shared on Facebook by a member of the Norwin Board of Education, Mr. Alex Detschelt, containing the "R-word" and later edited to include the "Reee" phrase. The District recognizes that many found his posts to be insensitive and offensive not only to our families of students with special needs, but to members of our school community.

The Norwin School District does not condone nor support the use of these terms in any capacity. While Mr. Detschelt spoke on his own behalf, it is important to note that his social media posts represent his personal views and do not represent, nor reflect, the views of the Norwin School District, the District Administration, or the Norwin Board of Education.

The Norwin School District and the Norwin Board of Education do not believe in discrimination on the basis of handicap, disability, or political affiliation in its educational or employment programs and activities. We believe in embracing empathy for all by promoting equality, diversity, and inclusivity.

The mission of the Norwin School District is to provide a positive, learner-centered environment that supports the growth of *all* students.

No further comment will be issued at present regarding this matter.

(Docket No. 41-1 at 6-7).  Also on October 28, 2022, the School District issued a press release (the

7

"Press Release"), which is substantially identical to the District's Statement.  (Docket No. 41, ¶ 27; Docket No. 41-1 at 8).

At the November 7, 2022, School Board meeting, the School District via the School Board presented a motion for censure, and with majority vote passed the motion to censure Detschelt (the "School Board's Censure" or the "Censure") in his capacity as a member of the Board of School Directors.  (Docket No. 41, ¶ 37).  The Censure read as follows:

> Motion to censure Alex Detschelt in his capacity as a member of the Board of School Directors for the following reasons:
>
> (a) Mr. Detschelt has made comments which are not consistent with the District's core values, including comments criticizing diversity and comments offensive to people with disabilities; and
>
> (b) Mr. Detschelt has repeatedly failed to state that his views are not the views of the Norwin School Board, that he does not have the authority or permission to speak on behalf of the Board and that his views are his alone; and
>
> (c) Mr. Detschelt has used his District-provided email address to criticize and speak disrespectfully toward members of the public who have expressed their opposition to his views or their intention to speak against his views.
>
> Further, the Board calls on Mr. Detschelt to apologize to members of the community for his comments, both his offensive comments and his disrespectful comments made to members of the public, and to further make clear that statements made by him are not being made on behalf of the Board.

(Docket No. 41-1 at 9).

According to the Third Amended Complaint, Detschelt avers that Dr. Taylor and/or the School District devised, issued, and publicly released the District's Statement, and drafted and passed the School Board's Censure, in retaliation for Detschelt's:  (1) prior criticism of School District policies and instructional material; (2) prior public criticism of, and opposition to, Dr. Taylor's performance as Superintendent and the School District's Administration; and (3) repeated print, television/radio, and online media appearances where his criticisms of the School District

and its administration were presented.  (Docket No. 41, ¶ 40).  Detschelt further alleges that Dr. Taylor and/or the School District devised, issued, and publicly released the District's Statement, and drafted and passed the Censure, which adversely affected Detschelt's protected speech as a private citizen:

> . . . making him far more reluctant to (1) criticize Dr. Taylor's performance as Superintendent or the School District Administration, (2) post potentially offensive political memes on Facebook, and (3) express himself in any manner, online or in person as a private citizen, under ongoing trepidation if such protected speech as a private citizen may result in being singled out by Dr. Taylor and/or the School District and being subjected to School District-initiated derision broadcast to a population at large.

(*Id.* ¶ 41).  Detschelt avers that Dr. Taylor and/or the School District issued the Statement and passed the Censure for the sole purpose and effect of chilling and deterring Detschelt "from engaging in pure speech and expressive conduct" protected by the First Amendment, "activity such as criticizing the administrative regime of the School District or privately posting potentially offensive memes or using potentially offensive language on private Facebook pages that are nonetheless within the ambit of speech covered by the First Amendment."  (*Id.* ¶ 43).  Detschelt avers that the District's Statement and the Censure adversely affected his "protected speech as a private citizen," *e.g.,* he received significant backlash from numerous "stakeholders" that included demands that he resign and express threats of physical violence on social media and messaging. (*Id.* ¶ 45).

The Third Amended Complaint asserts two claims:  Count I, 42 U.S.C. § 1983 – Retaliation in violation of the First Amendment (Detschelt v. the School District and Dr. Taylor in his individual capacity); and Count II, Pennsylvania Common Law Right of False Light Invasion of Privacy (Detschelt v. the School District and Dr. Taylor in his individual capacity).  (Docket 41 at 14, 18).  As to Count I, Detschelt alleges that he spoke as a private citizen in his Facebook posts

and that his speech was a matter of public concern. (*Id.* ¶¶ 53, 54). He avers that the Meme and comments were completely unrelated to his duties as a School Board Director, and that he was not acting in his official capacity as a School Board Director when he posted the Meme or made the additional comments. (*Id.* ¶ 55). Detschelt also contends that at the time Dr. Taylor released the District's Statement, he had a First Amendment right to free speech in the form of a post of a political meme that was "non-threatening in nature and nowhere near 'hate speech.'" (*Id.* ¶ 58). Detschelt avers that Defendants retaliated against him as a private citizen with official speech that was of a particularly virulent character, specifically, that of intimidation, intimating that punishment, sanction, or regulatory action will follow, with such in fact occurring by virtue of the Censure. (*Id.* ¶ 59). Count II, which is included for the first time in this fourth iteration of Detschelt's Complaint, alleges a claim of false light invasion of privacy under Pennsylvania common law. (*Id.* at 18).

The School District and Dr. Taylor filed their motion to dismiss the Third Amended Complaint, which has been fully briefed by the parties, and is now ripe for decision.

## II.     STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion to dismiss, the factual allegations contained in the complaint must be accepted as true and must be construed in the light most favorable to the plaintiff, and the court must "'determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007). While Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," the complaint must "'give the defendant fair notice of what the . . . claim is and the

10

grounds upon which it rests.'"  *Phillips*, 515 F.3d at 231 (quoting *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted)).  Moreover, while "this standard does not require 'detailed factual allegations,'" Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* (quoting *Twombly*, 550 U.S. at 555); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

It should be further noted, therefore, that in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  The Supreme Court has noted that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556). This "plausibility" determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The standard "'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element."  *Phillips*, 515 F.3d at 234 (quoting *Twombly*, 550 U.S. at 556).  Moreover, the requirement that a court accept as true all factual allegations does not extend to legal conclusions; thus, a court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555 (internal citation and quotation marks omitted)).

To review a complaint under this standard, the Court proceeds in three steps.  *See Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).  First, the Court notes the elements of a claim.  *See id.* (citing *Iqbal*, 556 U.S. at 675).  Second, the Court eliminates conclusory allegations.  *See id.* (citing *Iqbal*, 556 U.S. at 679).  And finally, the Court assumes the remaining well-pleaded

facts are true and assesses "'whether they plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679).

## III.   DISCUSSION

As previously explained in the Court's prior opinions addressing Defendants' motions to dismiss Detschelt's unsuccessful Complaint and Amended Complaint, Detschelt asserts his constitutional claim pursuant to 42 U.S.C. § 1983, which does not create any substantive rights, but instead provides a remedy for deprivations of rights created by the Constitution of the United States or federal law. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). Accordingly, "[t]o state a claim for relief in an action brought under § 1983, [a plaintiff] must establish that [he was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law."[5] *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). Detschelt asserts here that Defendants violated his right to engage in free speech without retaliation under the First Amendment to the Constitution of the United States.

### A.   First Amendment Retaliation

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. Not only does the First Amendment prohibit prior restraints on speech, but it has long been held that the First Amendment prohibits government officials from subjecting individuals to "retaliatory actions" after the fact for having engaged in protected speech. In order to plead a plausible claim of First Amendment retaliation, a plaintiff must adequately allege that: "(1) he engaged in 'constitutionally protected conduct,' (2) the defendant engaged in adverse retaliatory action 'sufficient to deter a person of ordinary firmness from exercising his

---

5       The parties do not appear to dispute that Dr. Taylor and the members of the School Board are state actors.

12

constitutional rights,' and (3) there is 'a causal link [ ] between the constitutionally protected conduct and the retaliatory action.'" *Ruttle v. Brady*, No. 22-3000, 2023 WL 5554648, at \*2 (3d Cir. Aug. 29, 2023) (quoting *Palardy v. Township of Millburn*, 906 F.3d 76, 80-81 (3d Cir. 2018) (citing *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006)) (additional internal quotation marks omitted)); *see Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017). It should be noted that the first element of a First Amendment retaliation claim concerns the plaintiff's conduct, while the second element concerns the defendant's conduct. *See Caristo v. Blairsville-Saltsburg Sch. Dist.*, 370 F. Supp. 3d 554, 570-71 (W.D. Pa. 2019).

### 1. **Allegations of Detschelt's Constitutionally Protected Conduct**

Like Detschelt's allegations in his Complaint and Amended Complaint, the Court notes that the allegations in his Third Amended Complaint and his briefs defending his pleadings continue to be unclear and confusing,[6] and that at times some allegations overlap and/or contradict each other, but the Court once again makes every attempt to address the allegations logically and thoroughly and affords Detschelt the grace typically provided to a *pro se* litigant. After setting forth his lengthy recitation of background factual allegations in the Third Amended Complaint – allegations that are largely unchanged from those averred in his previous Complaint and Amended Complaint – Detschelt ultimately alleges that the constitutionally protected conduct that is specifically at issue here concerns his First Amendment freedom of speech right to post "the Meme, including the word 'retard' found therein, along with additional comments, including the 'Reee' phrase." (Docket No. 41, ¶ 53). Detschelt avers that he spoke as a private citizen when posting the Meme and related comments, and that the Meme was a matter of public concern. (*Id.*

---

[6]      The Court notes, for instance, that, once again in the Third Amended Complaint, it is at times unclear when Detschelt is alleging that he was acting in his private capacity and when he is alleging that he was acting in his official capacity.

¶¶ 53, 54).  Detschelt further avers that the Meme and comments were completely unrelated to his duties as a School Board Director, and that he was not acting in his official capacity as a School Board Director when he posted the Meme and comments.  (*Id.* ¶ 55).  Detschelt alleges that Defendants retaliated against him as a private citizen with official speech that was of a particularly virulent character via issuing the Censure.  (*Id.* ¶ 59).  Detschelt further avers that Defendants qualified the Censure as being issued against him "in his capacity as a member of the Board" in an attempt to conceal that it was actually a censure of his protected speech as a private citizen.  (*Id.* ¶ 60).  However, Detschelt then goes on to allege that Defendants issued the Official Statement and the Censure in retaliation for (1) his prior public criticism of School District policies and instructional material, (2) his prior public criticism of and opposition to Dr. Taylor's performance as Superintendent and of School District administration, and (3) his repeated print, television/radio and online media appearances where his criticisms of the School District and Administration were presented (*id.* ¶ 61) – all of which consists of speech Detschelt made in his official capacity as a School Board Director.[7]

Although Detschelt argues that his First Amendment retaliation claim here is based only on his speech as a private citizen, the Court once again determines that Detschelt's claim appears to be based on allegations of two different expressive episodes :  (1) Facebook posts allegedly made by Detschelt as a private citizen; and (2) criticism of the School District voiced by Detschelt in his official capacity as a School Board Director.  For purposes of Defendants' current Motion, the parties do not appear to dispute that both are constitutionally protected, and the Court agrees.

---

[7]    For example, many of Detschelt's allegations concern his criticisms of the Superintendent/Administration that occurred during School Board meetings (Docket No. 41, ¶¶ 10-12, 14-17) and/or concern his "proper statements and topics to bring before the Board because they were fair comments and criticism" that were "asserted in order to address issues that were exclusively related to the administration of school business" (*id.* ¶ 13).

Therefore, the Court finds that the first element of Detschelt's First Amendment retaliation claim has been met. His Facebook posts and related commentary, whether made in his individual capacity or in his official capacity as a School Board Director, are nonetheless constitutionally protected from retaliation by the First Amendment.

### 2.  Allegations of Defendants' Retaliatory Actions

Detschelt alleges that Defendants retaliated against him by: (1)  releasing the District's Statement; and (2) passing the School Board's Censure.  (Docket No. 41, ¶ 61).  The parties still dispute, however, whether Detschelt adequately pleads facts showing that such actions by Defendants – the District's Statement (its own official speech in response to Detschelt's speech) and the School Board's Censure (an official statement adopted by a majority vote of an elected body regarding one of its elected members) – were, in fact, retaliatory actions.

### a.  The District's Statement

In ruling on Defendants' prior motions to dismiss, the Court considered whether the facts alleged in Detschelt's Complaint and Amended Complaint showed that the District's Statement, another form of speech, was a retaliatory action.  As Detschelt's allegations in the Third Amended Complaint have not changed in this regard, the Court's prior ruling on this issue remains undisturbed but is restated here for completeness.

As the Court previously explained in considering the allegations in Detschelt's earlier pleadings,  "[b]ecause the alleged retaliatory conduct by [Defendants] is in the form of [its] own speech (i.e. official speech), the Court must first determine whether this speech can amount to a retaliatory act before it can determine whether it could be sufficient to deter a person of ordinary firmness from exercising [his] constitutional rights."  *Caristo*, 370 F. Supp. 3d at 571 (citing *Mirabella*, 853 F.3d at 651 (explaining that when the alleged act of retaliation is the official's own

speech, "we employ a more specific test to determine whether the official's speech amounts to a retaliatory act")). "Official speech will only constitute a retaliatory act if it is of a 'particularly virulent character.'" *Id.* (quoting *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001)). This standard is in place because public officials – here, Defendants Dr. Taylor and the School District – have their own countervailing First Amendment free speech rights. *See id.* Under this test, the Court, considering the allegedly retaliatory speech at issue, asks "'whether there was a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow.'" *Id.* (quoting *Mirabella*, 853 F.3d at 651 (additional internal quotation marks and citation omitted)).

The "virulent character" test only applies, however, "if the case involves a matter of public concern" and not if the official's conduct relates to a matter of only private concern. *Caristo*, 370 F. Supp. 3d at 571 (citing *Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018)). This limitation on the application of the "virulent character" test, sometimes called an exception, is important because "[p]ublic policies supporting the 'virulent character test,' such as public interest in having officials fulfill their duties (which may require public criticism), are not in play when the speech concerns a private matter." *Id.* Generally, "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community . . . or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (internal quotation marks and citations omitted).

The Court previously applied the virulent character test to Detschelt's prior pleadings. In considering Defendants' motion to dismiss the original Complaint, the Court found that Detschelt's averred speech plausibly involved a matter of public concern – a conclusion that the

16

parties did not (and continue to not) dispute – so the District's Statement was subject to the "virulent character" test. (Docket No. 22 at 15). *See Caristo*, 370 F. Supp. 3d at 571-52. Then, when opposing Defendants' motion to dismiss the Amended Complaint (presumably in an attempt to avoid the application of the virulent character test), Detschelt next argued – somewhat confusingly, and in the alternative – that his constitutionally protected speech concerned a "private matter" *or* that his speech was a "matter of public concern" (although, in making such assertion, he did not differentiate between the two types of constitutionally protected speech that he alleges).[8] (Docket No. 29, ¶¶ 57, 58). Detschelt did not make his alternative public/private concern argument regarding his School District criticism, however, and he appeared to concede that his School District criticism is a matter of public concern. Therefore, for purposes of ruling on Defendants' motion to dismiss the Amended Complaint, the Court found (as it previously found in considering Defendants' motion to dismiss his original Complaint) Detschelt's School District criticism, made in his official capacity, to be a matter of public concern. (Docket No. 36 at 16). Thus, the Court concluded that, to the extent the District's Statement is speech responding to Detschelt's School District criticism, the virulent character test applies. (*Id.*).

Similarly, with regard to his Facebook posts, Detschelt previously argued (in opposing Defendants' motion to dismiss his original Complaint) that such posts were a matter of public concern – though Defendants did not explicitly agree.[9] Nevertheless, viewing Detschelt's allegations in the original Complaint in the light most favorable to him for purposes of considering Defendants' motion to dismiss, the Court found that Detschelt plausibly alleged that his Facebook

---

[8]      In his original Complaint, Detschelt alleged that his speech related directly to and involved matters of public concern, and the Court agreed. (Docket No. 1, ¶ 46).

[9]      *See* Docket No. 9 at 12 ("Setting aside the issue of whether Plaintiff's pejorative reference to a "[Expletive deleted] Retard" was protected by the First Amendment . . . .").

posts expressed a matter of public concern.  (Docket No. 22 at 13).  In so finding, the Court noted that such posts (which contained the terms "retard" and "Reee") pertained to a meme of Senator Fetterman and referred critically to "liberals" and Covid-related measures shortly before an election for which then-candidate Fetterman was on the ballot.  (Docket Nos. 1-1, 1-2, 1-3). Accordingly, the Court also determined that the virulent character test applies to Defendants' speech responding to Detschelt's Facebook posts.  (Docket No. 22 at 15).

Additionally, in response to Defendants' second motion to dismiss, Detschelt argued (in the alternative) that his Facebook posts involved a *private matter*, despite the fact that his Amended Complaint contained no new allegations regarding those posts.  Instead of amending these averments, Detschelt merely presented a new argument as to how the Court should evaluate these unchanged Facebook post allegations, contending that Defendants' response to those Facebook posts was "thereby making" those posts a private matter.  (Docket No. 29, ¶ 42).  Specifically, Detschelt conceded that his Facebook posts "taken as a whole" were "political in nature," and thus of public concern, but he argued that Defendants "focused on just one word [retard] that had no political connotation or sentiment, with the District's retaliatory actions relating only on [sic] that word."  (Docket No. 34 at 3).  Detschelt contended that Defendants focused too much on the use of the word "retard" in responding to his Facebook posts, and "failed to provide its own political speech as a countervailing viewpoint."  (*Id.* at 3-4).  Detschelt suggested various responses that Defendants could have provided in response to his Facebook posts, which would have contained an explicitly political message.  (*Id.* at 4).  Detschelt asserted that, since Defendants did not respond in such a manner, however, the word "retard" (and accompanying "Reee" phrase) should be considered in isolation without the surrounding context of his admittedly political posts, and the

18

use of such word(s) should be found *not* to constitute speech that is a matter of public concern.[10] (*Id.* at 4-5). The Court disagreed with Detschelt's argument. Previously, based on the allegations in the Complaint and for the reasons set forth in its Memorandum Opinion granting Defendants' first motion to dismiss, the Court found Detschelt's Facebook posts to be a matter of public concern – as Detschelt also urged at that time. Detschelt did not change his allegations in the Amended Complaint regarding these Facebook posts, nor did Detschelt provide any legal authority to support his argument that the Court should consider only one or two words or phrases from the Facebook posts, in isolation and while discarding the surrounding text and context, to find that such posts did not involve a matter of public concern. The Court was not persuaded by Detschelt's argument that Defendants, in choosing not to respond to the entirety of Detschelt's Facebook posts (which were admittedly of public concern) with "countervailing political speech," and instead electing to focus more narrowly on its disagreement with certain language that Detschelt used to express himself (and to clarify that Detschelt did not speak for the School District in such posts), the District thereby "made" Detschelt's speech a private matter. (Docket No. 36 at 18).

In ruling on Defendants' second motion to dismiss, the Court also disagreed with Detschelt's argument that the virulent character test should not be applied. The Court explained that the type of concern regarding private matters that was raised in *Conard* is simply not alleged here. (Docket No. 36 at 18). Notably, in *Conard* the private matter at issue – which merited an exception to the application of the virulent character test – was the plaintiff's job performance as a former employee, and the retaliatory speech was in the form of false statements by a former

---

[10]      In the Amended Complaint itself, Detschelt averred that "[a]lthough the Meme as a whole is of a political nature and thus considered a matter of public concern on its face," Defendants' response focusing on "the word 'retard,' without further context, thereby making Mr. Detschelt's instant speech non-political and a private matter (i.e., not a matter of public concern, no different than had he used any other English word by itself and without a political meme associated with it)." (Docket No. 29, ¶ 42).

public employer to the plaintiff's prospective employer in response to a reference request. *See* 902 F.3d at 182-83. The Court noted that other examples of speech that have been found to be of only private concern include: information about a particular individual's credit report that was available only to five subscribers who could not disseminate it further, *see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761-62 (1985); and in the context of a government employer regulating the speech of its employees, videos of an employee engaging in sexually explicit acts, *see San Diego v. Roe*, 543 U.S. 77, 84 (2004). (Docket No. 36 at 19). By contrast, Detschelt's Facebook posts, and the District's Statement responding to them, do not appear to raise such private concerns like those raised in *Dun & Bradstreet* and *San Diego*. (*Id.*). Rather, the District took issue with particular words Detschelt used to express his political messages, which the District considered offensive to it and its constituents, and with which it wished to disassociate. Thus, the Court concluded that, whether Detschelt's posts are viewed widely as criticism of a response to Covid, or whether they are viewed more narrowly focusing on usage of a certain word considered hurtful to a portion of the School Board's and District's constituents, such posts are matters of public and not private concern. (*Id.*). Therefore, the Court found that Detschelt had not shown that his Facebook posts involve a purely private matter, such that the "virulent character" test should not be applied to the School District's response. (*Id.*).

Detschelt's allegations in the Third Amended Complaint have not changed materially or otherwise cured these prior pleading deficiencies. Again, whether Detschelt's posts are viewed widely as a response to Covid or narrowly as using a certain word that is considered to be hurtful, the District's Statement indicated that the posts are not to be attributed to the Board, and are otherwise inconsistent with or even antagonistic to the District's Board-approved "Mission, Vision, and Core Values." (Docket No. 41-1 at 6-8). Accordingly, as the Court found twice

previously, the Court now finds yet again that the matters at issue are of public concern and thus necessitate application of the virulent character test to the District's Statement.  As previously noted, the District's Statement explained that the School District was made aware that Detschelt had posted the Meme and subsequent comments on Facebook containing the word "retard" and the term "Reeee" that "many found . . . to be insensitive and offensive not only to our families of students with special needs, but to members of our school community," and conveyed that the School District "does not condone nor support the use of these terms in any capacity" and that Detschelt's postings "represent his personal views and do not represent, nor reflect, the views of the Norwin School District, the District Administration, or the Norwin Board of Education."  (*Id.* at 6-7).  Similarly, the Court finds, in considering the allegations of the Third Amended Complaint, that the District's Statement, on its face, in no way conveys "'a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow.'"  *Mirabella*, 853 F.3d at 651 (quoting *McLaughlin*, 271 F.3d at 573).  The only reasonable reading of the Statement is that the District was disassociating itself from that language used by Detschelt to express himself on his own and without a majority vote or the collective endorsement of the School Board as a whole.  Accordingly, the Court concludes that the "'quantum of governmental authority brought to bear'" in the District's Statement is minimal.  *Id.* (quoting *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 88 (3d Cir. 1984)).

Ultimately, the Court finds that Detschelt's Third Amended Complaint fails to plausibly plead that the District's Statement constituted a retaliatory action against him.

### b.  The School Board's Censure

Next, the Court considers whether Detschelt avers in his Third Amended Complaint facts plausibly showing that the School Board's Censure constituted a retaliatory action.  As set forth,

21

*supra*, the language of the Censure (quoted in part in the Third Amended Complaint and attached in full thereto at Docket No. 41-1 at 9) expressly indicated, in pertinent part, that:  Detschelt made comments "not consistent with the District's core values, including comments criticizing diversity and comments offensive to people with disabilities"; he had repeatedly failed to state that his views are not the views of the School Board; he had used his District-provided email address to criticize and speak disrespectfully toward members of the public; and the Censure called for Detschelt to apologize to members of the community for his comments and to make clear that statements made by him are not made on behalf of the School Board.  (Docket Nos. 41, ¶ 37; 41-1 at 9).

The Court previously scrutinized whether Detschelt's First Amendment Retaliation Claim could be predicated on the Censure. In opposing Defendants' motion to dismiss his Amended Complaint, Detschelt asserted, without providing legal support, that the Censure "was a regulatory action, created by a governing body, namely, a majority of the members of the District's school board, was acted upon at a legislative meeting of the District as an agenda item . . . passed by a majority vote . . . which by any objective measure qualifies as an adverse regulatory action." (Docket No. 34 at 11). The Court disagreed, citing *Ruttle v. Brady*, No. 22-3000, 2023 WL 5554648 (3d Cir. Aug. 29, 2023), which addressed whether a First Amendment retaliation claim could be sustained where a censure was alleged to be an adverse retaliatory action.  (Docket No. 36 at 21-23).  As the Court previously explained, the plaintiff in *Ruttle*, a borough council member, alleged a First Amendment retaliation claim against his fellow council members and the borough, based on a council censure that he received after objecting to a council resolution.  *See* 2023 WL 5554648, at *1.  In that case, the Third Circuit affirmed the district court's determination that the censure at issue did not constitute an adverse retaliatory action, relying on the Supreme Court's decision in *Houston Community College System v. Wilson*, 595 U.S. 468, 479 (2022).  In *Houston*

*Community*, the Supreme Court reversed the appellate court and found that a college board of trustees' censure of one of its members, after years of acrimony, did not qualify as a materially adverse action consistent with the Court's case law.  Citing *Houston Community*, the *Ruttle* Court stated, "The Supreme Court recently held that a verbal censure of a public official unaccompanied by any punishment, like the one at issue here, is not an 'adverse' retaliatory action that can form the basis of a First Amendment retaliation claim."  2023 WL 555648, at *3 (citing *Houston Community*, 595 U.S. at 477-79).  The *Ruttle* Court remarked that the censure at issue in that case, like the censure in *Houston Community*, involved "'a censure of one member of an elected body by other members of the same body,'" and concluded that because the censure "'[did] not involve expulsion, exclusion, or any other form of punishment,'" similar to the censure at issue in *Houston Community*, such censure could not support a viable First Amendment claim.  *Id.* (quoting *Houston Community*, 595 U.S. at 482).

Nothing in the Third Amended Complaint or Detschelt's arguments to support it alters the foregoing analysis. The School Board's Censure in this case was issued against Detschelt as a single Board Director by his fellow School Board Directors – *i.e.,* against one member of an elected body by other members of the same body, just like the censures at issue in *Houston Community* and *Ruttle*.  And, like the censures in *Houston Community* and *Ruttle*, the School Board's Censure here did not involve expulsion, exclusion, or any other form of punishment.  Although Detschelt argues that the District's Censure was not merely countervailing speech but was an "act" unto itself that had punishing effects in the form of negative media coverage and reputational harm sufficient to deter a person of ordinary firmness from exercising his constitutional right of free speech, the Court does not agree.

The Censure at issue here is pure speech devoid of any virulent character.  Instructive here

23

are the words of Justice Gorsuch, who authored the *Houston Community* opinion for a unanimous

Court, and which the Third Circuit in *Ruttle* quoted, noting as follows:

> In this country, we expect elected representatives to shoulder a degree of criticism about their public service from their constituents and their peers – and to continue exercising their free speech rights when the criticism comes.  As this Court has put it, "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement" that it was adopted in part to "protect the free discussion of governmental affairs."  *Mills v. Alabama*, 384 U.S. 214, 218, 86 S. Ct. 1434, 16 L. Ed. 2d 484 (1966).  When individuals "consent to be a candidate for a public office conferred by the election of the people," they necessarily "pu[t] [their] character in issue, so far as it may respect [their] fitness and qualifications for the office."  *White v. Nicholls*, 3 How. 266, 290, 11 L. Ed. 591 (1845).

595 U.S. at 478.

> Justice Gorsuch continued:

> The First Amendment surely promises an elected representative like [plaintiff] the right to speak freely on questions of government policy.  But just as surely, it cannot be used as a weapon to silence other representatives seeking to do the same.  The right to "examin[e] public characters and measures" through "free communication" may be no less than the "guardian of every other right." Madison's Report on the Virginia Resolutions (Jan. 7, 1800), in 17 Papers of James Madison 345 (D. Mattern, J. Stagg, J. Cross, & S. Perdue eds. 1991).  And the role that elected officials play in that process "'makes it all the more imperative that they be allowed to freely express themselves.'"  *Republican Party of Minn. v. White*, 536 U.S. 765, 781, 122 S. Ct. 2528, 153 L. Ed. 2d 694 (2002).

*Id.*

Detschelt holds a public office by virtue of his election as a School Board Director, and he

certainly may express himself on matters of public concern even if his fellow School Board

Directors and the School District Superintendent disagree with him. The School District and its

Board likewise may themselves express their disagreement with Detschelt.  Both sides have done

so here, reflecting how the First Amendment is supposed to work, generating the "marketplace of

ideas" extolled by John Stuart Mill in *On Liberty* in 1859, and invoked innumerous times by the

24

Judiciary throughout our nation's history. *See, e.g., Abrams v. United States.,* 250 U.S. 616, 630 (1919) (Holmes. J., dissenting) (stating that "the ultimate good desired is better reached by free trade in ideas – that the best test of truth is the power of the thought to get itself accepted in the competition of the market"). Detschelt avers that his Facebook posts and related commentary were admittedly not received favorably by others, including the School District and his fellow School District Directors. While Detschelt has a constitutional right to express himself, so do others, and the First Amendment does not guarantee that his ideas will be praised, liked, or even accepted by others. Indeed, some ideas, or the verbiage, mode, or tone chosen to express them, especially by an elected official, may be deemed so odious by others such that it generates *opprobrium*. The First Amendment secures the right to express oneself, but it does not secure an immunity from the vicissitudes that come in a pluralistic society wherein people are equally free to reject others' ideas and modes of expression. Detschelt seems to misapprehend what the First Amendment secures and what it does not, for it is unreasonable for him to express ideas of public concern using invective language without risking strong criticism in return, especially given the fact that he is an elected public official serving a public school with a mission of educating children of all levels of development and capability. Detschelt avers that he paid a price for his protected speech in the form of negative media coverage and attendant reputational harm, yet the First Amendment does not insulate against such consequences.

Detschelt contends, however, that his fellow School Board Directors and the School District Superintendent did more than merely disagree with his Facebook posts and related commentary when they responded by issuing the District Statement and Censure. These responses to Detschelt's constitutionally protected speech, which are also constitutionally protected speech, are quite mild indeed, for they merely express disagreement with Detschelt's chosen manner of

expressing his public commentary, declare their disassociation from it, and further declare that Detschelt does not speak for them – all without any threat of punishment, sanction, or other indicia of virulent character. The fact that the School Board registered its collective disagreement, as mild as it was, by voting to issue the Censure and its call for Detschelt to apologize (without any threat or insinuation of consequence should he fail to do so) does not convert their disagreement into an adverse regulatory sanction of a virulent character.  As the Supreme Court concluded in *Houston Community* and as the Third Circuit held in *Ruttle*, the Court here finds that the School District's Statement and the School Board's Censure do not constitute adverse retaliatory actions and cannot support a viable First Amendment retaliation claim.  Detschelt does not point to any new factual allegations in his Third Amended Complaint, nor to any new legal precedent, that would make it so.

Finally, Detschelt persists in arguing, without helpful explanation or reliance on any controlling legal authority, that his Meme and related comments were completely unrelated to his duties as a School Board Director and that the Censure is unconstitutionally retaliatory because it censured him for "private citizen speech" expressed in his official capacity as a School Board Director.  (Docket No. 46 at 18-25). Detschelt contends that the Censure is of him as a private citizen by a government body, so the Court here should consider whether the Censure was sufficient to deter a private citizen of ordinary firmness from exercising constitutional rights without first applying the "virulent character" test.  (*Id.* at 18-21 (citing *Mirabella*, 853 F.3d at 641, and other cases involving retaliatory actions against private citizens and/or public employees)).[11]  Detschelt further argues, in the alternative, that the "virulent character" test would

---

[11]     Detschelt's reliance on *Mirabella v. Villard*, 853 F. 3d 641 (3d Cir. 2017) is misplaced.  In that case, the plaintiffs, a married couple and each a lawyer, were in a dispute with their neighbors over their neighbors' use of wetlands owned by the local township that abutted their respective properties.  The plaintiffs complained to the township about the situation and then threated legal action. In response, the chairman of the township's board of

be satisfied, even if it does apply, because the Censure was issued "against [his] private speech" due to criticism he made as a member of the School Board. (*Id.* at 21-23 (stating that "Detschelt's *private citizen speech* is due to [his] storied and continued criticism of the administrative regime of the School District as a board member" (emphasis in original))).

Detschelt's arguments are circular, nonsensical, and borderline specious. First, Detschelt himself alleges that the School Board's Censure expressly states that it was to censure him "in his capacity as a member of the Board of School Directors." (Docket No. 41, ¶ 37; Docket No. 41-1 at 9). Second, Detschelt characterizes his speech as "private citizen speech" because, in his words, "the criticism of the District is related to [his] public service as a board member and used in the Amended Complaint and herein only to show the retaliatory motive by the District." (Docket No. 46 at 22). This is a *non sequitur*.

Even so, it is undisputed that the School District – which is governed by the School Board of which Detschelt is an elected Director – educates students with disabilities, and Detschelt's social media posts admittedly included language viewed by some as derogatory toward people with disabilities. Detschelt seems to misapprehend the reality that, as a publicly elected official, he cannot completely divorce his publicly expressed personal opinions from the effect and amplitude his public comments have on members of the public (especially those comments directly

---

supervisors sent them an email instructing them to never contact him or other township employees directly and never to call or email him at work and never to speak to him in public or private. The Third Circuit determined that this email "barred [plaintiffs] from communicating directly with their local government, for any reason, indefinitely" and that this prohibition was "sufficient to deter a person of ordinary firmness from exercising his constitutional rights." 853 F. 3d at 650 (internal quotation marks and citation omitted). The "no contact" email in *Mirabella* is patently distinguishable from the Censure here. The plaintiffs in *Mirabella* were private citizens who were denied their right to communicate directly with their local government, whereas the Censure here involved a majority vote of publicly elected School Board Directors expressing disagreement with one of their fellow publicly elected School Board Directors regarding a matter of public concern to their constituents. The Censure did not expel Detschelt from the School Board, preclude him from participating in its meetings, or preclude him from exercising his Director duties or otherwise bar him from speaking.

related to the School District's relationship with students and families it serves) by virtue of his elected office.  Therefore, the Court finds that Detschelt's Third Amended Complaint fails to establish that the Censure passed by the School Board plausibly constitutes a retaliatory action against him in violation of the First Amendment.

### c.  Summary

Detschelt has failed to plausibly plead that the District's Statement or its Censure were retaliatory actions necessary to establish a First Amendment retaliation claim.  Therefore, the Court need not consider the third element of such claim, whether Detschelt has pled a causal link between his protected speech and the purported retaliatory actions.  Accordingly, Detschelt's First Amendment retaliation claim will be dismissed for failure to state a claim upon which relief can be granted.  As the Third Amended Complaint represents the fourth iteration of the Complaint, and the third opportunity Detschelt has had to cure the deficiencies previously identified by the Court in the course of this litigation, and as each of his successive iterations have been relatively devoid of additional factual support, it is plainly evident that Detschelt has proven unable to proffer factual allegations showing a plausible entitlement to relief, and the Court finds that further opportunity to amend would be futile.  *See Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 113 (3d Cir. 2018).  Therefore, Detschelt's claim at Count I will be dismissed with prejudice.

### B.  Count II:  False Light Invasion of Privacy under Pennsylvania Law

For the first time in this case, Detschelt now purports to allege a state law claim for False Light Invasion of Privacy in violation of Pennsylvania common law.  (Docket No. 41 at 18-25). Even if the Third Amended Complaint contains sufficient allegations to state a plausible claim for such tort under Pennsylvania law – regarding which the Court expresses no opinion – the Court could only consider this claim under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

28

However, 28 U.S.C. § 1367(c) provides that district courts "may decline to exercise supplemental jurisdiction over a claim . . . if . . . (3) the district court has dismissed all claims over which it has original jurisdiction."  Additionally, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so."  *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995).

There is nothing unique about this case such that considerations of judicial economy, convenience, and fairness would provide an affirmative justification for exercising supplemental jurisdiction over Detschelt's newly pled state law false light claim.  After nearly three years of persistent arguments concerning threadbare allegations of First Amendment retaliation, the case has never progressed beyond the pleading stage.  There is no basis upon which to retain this case, including judicial economy, convenience, or fairness to the parties.  Rather, what remains of this case, if anything, concerns whether local elected school officials cast another local elected school official in a false light implicating a common law tort.  Respect for federalism therefore also weighs in favor of declining to exercise this Court's supplemental jurisdiction.  Accordingly, in this instance, the Court will decline to exercise supplemental jurisdiction over such claim and will dismiss Count II without prejudice to Detschelt's ability to bring such claim in state court if it is timely and otherwise cognizable.  As the Court will dismiss Count II on such basis, Defendants' motion to dismiss Count II for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6), will be denied as moot.

## IV.    <u>CONCLUSION</u>

For the reasons stated, Defendants' Motion to Dismiss Plaintiff's Third Amended

Complaint is **<u>granted in part and denied in part</u>**.  The Motion is granted to the extent that Detschelt's First Amendment retaliation claim at Count I is **<u>dismissed</u>** pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  As the Court finds that further amendment of Count I would be futile, such claim is dismissed **<u>with prejudice</u>**.  Additionally, the Court declines to exercise supplemental jurisdiction over Detschelt's state law claim at Count II, and that claim is **<u>dismissed without prejudice</u>** to Detschelt's ability to bring such claim in state court.  As Count II is dismissed on such basis, to the extent Defendants' Motion seeks dismissal of Count II pursuant to Rule 12(b)(6), the Motion is **<u>denied as moot</u>**.

An appropriate Order follows.


Dated: August 10, 2026                         *<u>s/ W. Scott Hardy</u>*
                                               W. Scott Hardy
                                               United States District Judge


cc/ecf:  All counsel of record
         Alexander Detschelt